Adam M. Slater, Esq. (ID#: #046211993)
Matthew R. Mendelsohn, Esq. (ID#: 015582005)
**MAZIE SLATER KATZ & FREEMAN, LLC**
103 Eisenhower Parkway
Roseland, New Jersey 07068
(973) 228-9898
*Attorneys for Plaintiffs*

| | |
|---|---|
| **IN RE ALLERGAN BIOCELL TEXTURED BREAST IMPLANT PRODUCTS LIABILITY LITIGATION** | **SUPERIOR COURT OF NEW JERSEY LAW DIVISION: BERGEN COUNTY**<br><br>**MCL CASE NO. 634**<br><br>**MASTER DOCKET NO. BER-L-5064-20**<br><br>**CERTIFICATION OF MATTHEW R. MENDELSOHN** |

MATTHEW R. MENDELSOHN, of full age, certifies as follows:

1.      I am a partner at Mazie Slater Katz & Freeman, LLC ("Mazie Slater") in Roseland, New Jersey. I respectfully submit this certification in support of Plaintiffs' Motion for Reconsideration and/or Appeal of Special Master Case Management Order No. 32. This certification is based on my personal knowledge of the facts set forth herein.

2.      A true and accurate copy of the September 14, 2021 Case Management Conference transcript is attached as **Exhibit "A."**

3.      A true and accurate copy of relevant portions of the deposition transcript of Roger Huff is attached as **Exhibit "B."**

4.      A true and accurate copy of relevant portions of the deposition transcript of Victor Huynh is attached as **Exhibit "C."**

I declare under penalty of perjury that the foregoing is true and correct. I am aware that if

any of the foregoing statements made by me are willfully false, I am subject to punishment.


Dated: September 18, 2024                    _____
                                             Matthew R. Mendelsohn
                                             Adam M. Slater
                                             **MAZIE SLATER KATZ & FREEMAN, LLC**
                                             103 Eisenhower Parkway
                                             Roseland, New Jersey 07068
                                             Telephone:  (973) 228-9898

# EXHIBIT A

```
 1                          -  -  -

 2

 3     IN RE:  ALLERGAN BIOCELL TEXTURED  :

 4     BREAST IMPLANT PRODUCTS LIABILITY  :    MCL No. 634

 5     LITIGATION                         :

 6

 7

 8                          -  -  -

 9              CASE MANAGEMENT CONFERENCE

10                          -  -  -

11

12    DATE:           SEPTEMBER 14, 2021

13    BEFORE:         THE HONORABLE JOSEPH A. DICKSON, USMJ

14                    THE HONORABLE RACHELLE L. HARZ, JSC

15

16         (ALL PARTICIPANTS APPEARING REMOTELY)

17

18

19

20

21

                             -  -  -

22

          CONSTANCE E. PERKS, CRR, CCR, CLR, CRC, RSA

23

24              GOLKOW LITIGATION SERVICES

          ph 877.370.3377  |  fax 917.591.5672

25                   deps@golkow.com
```

```
 1   REMOTE APPEARANCES:
 2   COUNSEL FOR PLAINTIFFS:
 3   MAZIE, SLATER, KATZ & FREEMAN, LLC
     BY: ADAM M. SLATER, ESQUIRE
 4   BY: MATTHEW R. MENDELSOHN, ESQUIRE
     103 Eisenhower Parkway
 5   Roseland, New Jersey 07068
     973.228.9898
 6   aslater@mskf.net
 7
     CARELLA BYRNE CECCHI OLSTEIN BRODY & AGNELLO, P.C.
 8   BY:  DONALD A. ECKLUND, ESQUIRE
     5 Becker Farm Road
 9   Roseland, New Jersey 07068-1739
     973.994.1700
10   decklund@carellabyrne.com
11
     SEEGER WEISS, LLP
12   BY:  MAX KELLY, ESQUIRE
     BY:  JENNIFER LENZE, ESQUIRE
13   55 Challenger Road, 6th Floor
     Ridgefield Park, New Jersey 07660
14   973.639.9100
     mkelly@seegerweiss.com
15
16   BERGER MONTAGUE
     BY:  SHANON J. CARSON, ESQUIRE
17   1818 Market Street, Suite 3600
     Philadelphia, Pennsylvania 19103
18   215.875.3000
     scarson@bm.net
19
20   FEGAN SCOTT
     BY:  ELIZABETH FEGAN, ESQUIRE
21   BY:  JESSICA MEEDER, ESQUIRE
     1200 G Street, NW, Suite 800
22   Washington, D.C. 20005-3820
     202.921.6007
23   beth@feganscott.com
     jessica@feganscott.com
24
25
```

```
 1   REMOTE APPEARANCES, CONTINUED:
 2

     MOTLEY RICE
 3   BY:  SARAH T. HANSEL, ESQUIRE
     210 Lake Drive East, Suite 101
 4   Cherry Hill, New Jersey  08002
     856.667.0500
 5   shansel@motleyrice.com
 6

     PANISH SHEA & BOYLE
 7   BY:  PETER KAUFMAN, ESQUIRE
     BY:  WYATT VESPERMANN, ESQUIRE (via telephone)
 8   11111 Santa Monica Blvd., Suite 700
     Los Angeles, California 90025
 9   310.477.1700
     kaufman@psblaw.com
10
11   COUNSEL FOR DEFENDANT ALLERGAN:
12

     REED SMITH, LLP
13   BY: MELISSA A. GEIST, ESQ.
     136 Main Street, Suite 250
14   Princeton, New Jersey 08540
     609.514.5978
15   mgeist@reedsmith.com
16   -and-
17   REED SMITH, LLP
     BY:  JANET H. KWUON, ESQUIRE
18   BY:  MILDRED SEGURA, ESQUIRE
     355 South Grand Avenue, Suite 2900
19   Los Angeles, California  90071
     jkwuon@reedsmith.com
20

     SONJA S. WEISSMAN, ESQUIRE
21   Reed Smith, LLP (San Francisco)
22

     DAVID E. STANLEY, ESQUIRE
23   Reed Smith, LLP (Los Angeles)
24   DAVID R. COHEN, ESQUIRE
     Reed Smith, LLP (Pittsburgh)
25
```

```
 1    REMOTE APPEARANCES, CONTINUED:

 2

      DUGHI HEWIT & DOMALEWSKI

 3    BY:  BRANDON D. MINDE, ESQUIRE

      340 North Avenue

 4    Cranford, New Jersey 07016

      908.272.0200

 5    bminde@dughihewit.com

      Counsel for Defendant Richard D'Amico

 6

 7    ALSO PRESENT:

 8    Alex Glassman, Trial Court Law Clerk

      Brittany Manna, Judicial Law Clerk

 9

      Jenny Chung, Legal Assistant to Judge Dickson

10

11    (Participating via telephone #8080, #4251)

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    (Proceedings commenced at 11:09 a.m.)

 2                    JUDGE HARZ:  Okay.  Judge Dickson, do

 3     you want to start off?

 4                    JUDGE DICKSON:  That's fine with me.

 5     Let's go there.  So who goes first, Mr. Kelly or

 6     Mr. Cohen?

 7                    MR. KELLY:  I'm happy to tee up the

 8     issue.

 9                    Essentially, there are a large number

10     of ESI data sources at issue in this case.  We have

11     narrowed the upcoming ESI 30(b)(6) deposition to

12     five of those at this point.  One is TrackWise.  We

13     got a user manual for TrackWise at the end of last

14     month.  We have repeatedly requested user manuals

15     and other secondary materials as they relate to

16     relevant repositories of ESI for years now,

17     including the most recent conference and most recent

18     letter.  We haven't received those for any of the

19     other four sources.  It is our understanding that

20     defendants were going to provide those.

21                    That's essentially where we are.

22                    JUDGE DICKSON:  Mr. Cohen.

23                    Mr. Kelly, if I can interrupt you.

24     I'm sorry.  I apologize.

25                    Mr. Cohen, based on what I read in
```

1    the letter and what I think Judge Harz read, too,

2    and I know that she has some thoughts about this, it

3    looks like those manuals and user programs and all

4    that, that you have talked about turning them over,

5    but you just haven't done it yet.  And there's an

6    indication that maybe some don't exist, which is --

7    I would like you to explain that.  If they don't

8    exist, why could -- how do your people work with

9    that software without any kind of user manual?

10                   MR. COHEN:  Right.  So we have asked

11   about user manuals and other materials for all five

12   of those data sources.  The one that we have a user

13   manual for is the CPR database, essentially the

14   complaints database, and we've turned that over.

15                   The plaintiffs have asked us for user

16   manuals and database schema or folder structures for

17   the Skype box, voicemail, and SharePoint, as you

18   know, and we don't have those.  We've checked with a

19   couple of people.  First of all, the technical

20   people didn't even understand what they were talking

21   about in terms of database schema and folder

22   structures.  That wouldn't apply to a couple of

23   these document types.

24                   But users, like there was about like

25   28 databases all together, and most of them don't

 1    have user manuals.  Users that use them are trained

 2    on how to use them.  And so it's not that we're

 3    holding back on user materials that we have for

 4    those databases.  The users know how to use them,

 5    and certainly at the 30(b)(6) deposition, the

 6    plaintiffs can ask any questions they have about how

 7    to use those different systems.

 8              JUDGE DICKSON:  All right.  So why

 9    don't you have your deponents, prior to the

10    deposition, sign some kind of declaration about

11    specifically what does not exist.

12              MR. COHEN:  Sure, we can do that.

13              MR. KELLY:  That would be enough for

14    plaintiffs.  And at this point, we would like

15    whatever secondary information that could help make

16    that deposition more efficient.  We have not yet

17    heard before just now that these documents didn't

18    exist.  So, if they don't, again, something in

19    writing with a signature on it would be helpful in

20    advance of the deposition enough that we can cure

21    any issues before the deposition.

22              MS. KWUON:  I would just add a

23    footnote to that piece.  In the inquiry about

24    whether those documents exist, people have looked in

25    the appropriate places for them.  There is always

1   the possibility, so it's hard to say, you know, when

2   you talk about [indiscernible word] wide, there's

3   always the possibility that somebody has a copy of

4   something, you know, squirreled away in an email

5   attachment or on a drive somewhere.  But based on

6   the reasonable inquiry and research we have done,

7   those documents don't exist.

8              And as to the schema, I think that

9   Max and I talked about this a little bit, it's a

10  document that the company doesn't have.  We would

11  have to go to Sparta, which is the third party that

12  actually provides the generic tool, and then it's

13  customized as it relates to the way the company uses

14  it.  So it's something, again, that the company

15  doesn't have.

16             And I think to answer a little bit

17  some of the questions, as to some -- some of the

18  databases are also retired, so it's another reason

19  why something like what might be called a user's

20  manual doesn't appear to exist.

21             JUDGE DICKSON:  Well, the whole point

22  is that the plaintiffs are entitled to know how this

23  data is used, stored, manipulated, changed,

24  whatever, archived, pulled out of archives.  I don't

25  mean to tell you that you -- I know you know that.

```
 1                    But rather than having a multiday

 2   deposition, let's make sure within -- it's scheduled

 3   for the 28th, correct?

 4                    MR. KELLY:  Correct.

 5                    JUDGE DICKSON:  So I would say that

 6   everything you need to get, including a declaration

 7   of what you cannot find or what, apparently, does

 8   not exist based on a reasonable search and maybe

 9   give a little bit of that to Mr. Kelly so he doesn't

10   have to spend an hour asking how have you searched,

11   because those are very time-consuming and annoying

12   questions in a deposition.

13                    I agree, it's discovery on discovery,

14   and I get it, but this has got to move.  This has

15   got to move, and it's time for them to have all of

16   that information, because I really want to get to

17   the substantive discovery in this case.

18                    JUDGE HARZ:  Can I ask a silly

19   question?  At this deposition on September 28th, the

20   individual who is being deposed, is that individual

21   going to have multiple screens in front of him, so

22   that if he is asked a question about box or

23   voicemail, he would be able to show during the

24   deposition what to access or where that information

25   would be, or are you doing this in a vacuum without
```

1    any computer or computer access?

2              MR. COHEN:  So there are two

3    different deponents.  One deponent is speaking to

4    SharePoint, Skype box, and voicemail, and the other

5    is speaking to CPR TrackWise.

6              The thing to remember about these

7    systems is this really is very collateral to any of

8    the merits about this case.  These systems are not

9    set up just for complaints, other than the CPR

10   TrackWise system.  So to the extent that -- and

11   we've questioned whether it's appropriate to have

12   any discovery at this stage since it is, as cases

13   point out, it's a discovery about discovery.  There

14   have been no issues yet.  These are just among the

15   28 databases that we said we were going to search

16   for responsive information.

17             So our view has been that this is all

18   quite premature discovery.  However, we have put up

19   these witnesses and the thought is that they will

20   provide whatever background information they are

21   asked about.  If that leads to questions, it could

22   yield some sources of data that we're not searching

23   for, we can start to reach out.  But we are not in a

24   stage where anybody has said, Oh, we're having

25   trouble pulling out data or searching for data.

September 14, 2021

 1   None of that has happened.  There's no reason for --

 2                  JUDGE HARZ:  Can I just ask you a

 3   question?  You said that Skype box, voicemail, and

 4   SharePoint weren't set up for complaints.  TrackWise

 5   was?

 6                  MR. COHEN:  That is the basic

 7   complaint system.

 8                  JUDGE HARZ:  Okay.  So then the

 9   question is going to be, in Skype box, voicemail,

10   and SharePoint, how does one access where complaints

11   would be stored?  Okay.  So my question is, the

12   person who is answering this is responding to, at

13   this deposition, to that specific question about

14   where are complaints stored in these four systems.

15                  Is that person going to have access,

16   right then and there, with screens to show, you

17   know, at the deposition, how it is accessed?

18   Because how do you describe that?  You need to show

19   that.

20                  MR. COHEN:  Right.  So we have not

21   gotten to the point yet where we know even that

22   there are complaints stored in any of these systems.

23   So what we have been focusing on is the -- first,

24   the data sources most likely to have relevant

25   discoverable information.  So our initial focus has

```
 1   been on CPR TrackWise system and restoring the

 2   email, and we have identified 38 custodians that

 3   have email, and we've gotten from the plaintiff

 4   their preferences as to what order we treat those

 5   custodians in, and we're he basically following

 6   their request.

 7              There are going to be hundreds of

 8   thousands, probably millions of documents in that

 9   email which are responsive.  That's where we are

10   starting to focus.

11              JUDGE HARZ:  Okay.  Okay.

12              MR. COHEN:  We looked at these other

13   database sources as things that we are going to look

14   into as to whether there's other discoverable

15   information.  That's a process and that's going to

16   go on.  That's one of the reasons why we're saying

17   this discovery about discovery is premature.  We're

18   not at a point where we found, Oh, there's a lot of

19   stuff in Skype that's relevant to the case.

20              JUDGE HARZ:  When was TrackWise put

21   into effect?  I just forget right now.

22              MR. COHEN:  Janet, if you can help me

23   out there.  I don't remember the exact date.  I

24   think it's in our disclosure.

25              JUDGE HARZ:  Okay.  Whenever that is.
```

1    So that's when complaints are all placed in

2    TrackWise, one nice, neat place.  So the complaints

3    prior to that, you're saying, perhaps are not in

4    these four, you know, Skype box, voicemail,

5    SharePoint, but, rather, it would be in some

6    custodian's email somewhere.  Is that what you're

7    saying?

8                    MR. COHEN:  Yes.  We have not gotten

9    to the point where we have fully investigated all 28

10   databases to know where everything is.  The

11   information that we have gained about the databases

12   we have made available to the plaintiffs in the five

13   different disclosures that we've done in writing so

14   far.  Those investigations of the data sources

15   outside of email are continuing.

16                   And so we -- discovery is going to go

17   on for a while and we're going to be continuing to

18   look for anything that is responsive for this case,

19   and we will be continuing to meet and confer with

20   plaintiffs and informing them of what we find.  But

21   I can't -- I don't know the answer right now,

22   sitting here, unless Janet or Melissa does, as to

23   whether we know of existing complaints prior to the

24   CPR TrackWise system where -- whether those are in

25   any one particular system outside of email.

1                    Janet, do you know anything or have

2    any idea on that?

3                    MS. KWUON:  Sure.  The TrackWise is

4    managing all known complaints at this time, and for

5    any predecessor systems, they are transferred or

6    migrated into TrackWise.

7                    JUDGE DICKSON:  That was my question.

8                    MS. KWUON:  Yeah.  So it's the body

9    of where everything sits now.  There are older

10   versions of things in the past.  So the witness is

11   going to talk about TrackWise, which is what he is

12   most familiar with.  He has been living in that

13   space for about a decade.  And then the predecessor

14   systems, as well, to the extent that there's

15   information and he knows information about them.

16                   MR. KELLY:  Your Honor, just to --

17   I'm sorry.  Just to clarify the potentially

18   discoverable information within the Skype, voicemail

19   box, SharePoint system, isn't -- it isn't limited to

20   complaints specifically, and it is the plaintiffs'

21   understanding that all the complaints have been

22   migrated into TrackWise from the predecessor

23   systems.

24                   JUDGE HARZ:  Thank you.

25                   JUDGE DICKSON:  So then is there any

1   decision right now that Judge Harz and I are called

2   upon to make?  It sounds like you're going to get a

3   declaration or somethings under oath, signed,

4   regarding what you cannot find or what does not

5   exist, whatever the most appropriate way to say that

6   is, the most truthful way to say that.  I know you

7   will do that.  And then you will have it in time so

8   the deposition can go forward of the two deponents

9   on September 28th.  Correct?

10                  MR. COHEN:  Yes.  And just to be

11  clear about that, we don't have user manuals for

12  the -- we haven't found user manuals for the

13  systems, other than CPR TrackWise.  Some of them,

14  those other questions are not applicable, like

15  database schema, folder structures.  One or two

16  systems do have folder structures, but there are

17  reasons that they would not be helpful in locating

18  the documents.  Would not be -- you know, nothing

19  that we could find and turn over in any easy manner.

20                  That can all be explained in --

21                  JUDGE HARZ:  Would you be able to put

22  in writing to Mr. Kelly, he's asking for something

23  in writing, signed, that there are no XY&Z

24  pertaining to Skype box, voicemail, and SharePoint?

25  He wants that in writing and signed.  When could you

1   get that to him?

2                    MR. COHEN:  Subject to what Janet

3   said, based on our reasonable investigation, talking

4   with people who know the most about these systems,

5   what they know, find out, checking.  So, yes, we

6   would be able to do that.  And that deposition is

7   scheduled for the 28th, and I would think that

8   certainly within a few days prior to the deposition

9   we would be able to get that to the plaintiffs.

10                   JUDGE HARZ:  Why don't we say by the

11  22nd, September 22nd.

12                   MR. COHEN:  Yes.

13                   MR. KELLY:  Thank you, Your Honor.

14                   JUDGE DICKSON:  All right.  So then

15  can we move to the organizational information?

16                   MR. COHEN:  Excuse me.  I want to

17  thank you.  I'm the one with the conflict, so if I

18  might have your permission to excuse myself for the

19  rest of the conference.  And thank you for

20  accommodating my schedule today.

21                   JUDGE DICKSON:  I note that it's

22  11:22.  If you could stay until 11:30 -- no, I'm

23  kidding.

24                   JUDGE HARZ:  Good luck, Mr. Cohen,

25  wherever you are going.

 1                    MR. COHEN:  Thank you very much.  I

 2    appreciate.  Take care.

 3                    MR. KELLY:  Your Honor, if we wanted

 4    to frontload the ESI conflicts, there is the

 5    exemplar issues intertwined with that, although I'm

 6    happy to defer that until later in the call.

 7                    JUDGE HARZ:  The exemplar issue is on

 8    page 6 of the September 9, 2021 letter.  Basically,

 9    I think what we're dealing with now is plaintiffs

10    are saying they have three -- okay.  Allergan is

11    producing exemplar adverse event reports.  There are

12    three issues that plaintiffs wish to follow up on,

13    and defendants have not responded to those inquiries

14    to date.  I think that's --

15                    MR. KELLY:  Yes.  So the request is

16    for additional, you know, either fulsome answers to

17    those questions or additional exemplars that sort of

18    contain or point to or illuminate the answers to

19    those questions.

20                    JUDGE DICKSON:  Was that Mr. Cohen

21    that was just let go who should answer that, or can

22    Ms. Kwuon answer that?

23                    MS. KWUON:  I think I can answer some

24    of these questions.

25                    So with regard to attachments to the

September 14, 2021

```
 1   three exemplars that we provided, we are confirming

 2   it was when we made the request that it was the full

 3   PDF along with all the attachments.  Somebody is

 4   going back to just double check and make sure that

 5   that was what was produced.  I believe that's the

 6   case.  It looks like it.  We don't seem to be

 7   missing anything, but we're confirming that.

 8                   As to whether or not there are

 9   additional product complaint reports that can be

10   provided over the entire sequence of time, as we've

11   explained and I confirmed earlier, everything is

12   being managed through the current system and we

13   already kind of have moved to a discussion and

14   agreement with regard to extraction of fields of

15   information from that to include all the complaints

16   that we believe are relevant, which are the

17   confirmed and suspected ALCL-related cases.

18                   And so the additional requests are --

19   you know, these additional add-ons that require us

20   to kind of stop and respond to things that are

21   taking away from what we're trying to do, to get the

22   full body of data out to plaintiffs as soon as

23   possibility.  So the sort of the lingering ask of,

24   you know, can you give us one that's representative

25   of XY and Z, or, you know -- this year, at some
```

```
 1    point, I think there was even a discussion about one

 2    per year, or something like that.

 3              It's difficult for us to keep kind of

 4    down that path as we're trying to prioritize getting

 5    the electronic extraction, which I think will be all

 6    of the answers, I hope, most of the answers to all

 7    the questions that are at issue.

 8              MR. KELLY:  Your Honor, so if I can

 9    respond to that.

10              JUDGE DICKSON:  Go ahead.

11              MR. KELLY:  The first issue is that

12    it sounds like we still don't have confirmation that

13    the exemplars that were produced are the full files.

14    We still don't have confirmation on that.

15              Is that correct, Janet?

16              MS. KWUON:  No.  I would say that

17    when we went back and looked, it appears to be.

18    I've asked someone to check again.  I don't know

19    whether counsel is thinking something is missing.

20    But, you know, when I come back and write to you and

21    say it absolutely is triple checked, that's what I

22    just want to make sure we're doing.  We checked.  It

23    appears to be what it's supposed to be.  But I want

24    to get a triple check before I send that back to you

25    in writing.
```

September 14, 2021

```
 1                    JUDGE HARZ:  Is this in TrackWise?

 2                    MR. KELLY:  Yes.

 3                    JUDGE HARZ:  The exemplar adverse

 4     event reports?

 5                    MS. KWUON:  Yes.

 6                    JUDGE HARZ:  Is this something at the

 7     deposition that can be delved into at that time?

 8     Will that individual be able to say, Okay, here is

 9     this adverse event report, it's in TrackWise, and

10     all the documents having to do with the adverse

11     event report are here or not here, or elsewhere?

12     Will this person know that?

13                    MS. KWUON:  He's coming from the IT

14     side of the program, so similar to what we might

15     think of if we call an IT person to help with

16     emails.  He can answer questions regarding the

17     technology side of it.  The crossover into actual

18     content, there may be some parts he can answer from

19     an IT perspective, but it's different also from a

20     business user who is, you know, actually using the

21     communications.

22                    JUDGE HARZ:  Who would know that?

23                    MS. KWUON:  We're in the middle.  So

24     what we're doing is we're actually talking to the

25     business people who track -- who work on the
```

1    documents, attach the attachments, kind of click on

2    everything that looks like there should be an

3    attachment to confirm that there is an attachment

4    and then to compare that to what was delivered to us

5    as the attachment.

6                JUDGE HARZ:  I'm just wondering is

7    there someone else who should be deposed who can say

8    whether or not the exemplar adverse event report is

9    everything, or where other information about that

10   adverse event report is in your system.  That's what

11   I'm trying to figure out.

12               MS. KWUON:  So if we're able to

13   confirm -- one is my confirmation is that it is

14   complete.  I'm asking someone to triple check it.

15   After we triple check it, I believe that that should

16   be, you know, as far as we can tell, you know, no

17   indication that there's something missing.

18               I haven't heard from counsel that

19   they see anything to suggest that something is

20   missing, or that there's a reference to a document

21   that actually wasn't provided as an attachment.  So

22   what I would like to do --

23               JUDGE DICKSON:  Let's -- let's hear

24   from Mr. Kelly on -- I want to hear from Mr. Kelly

25   on that.

September 14, 2021

```
 1                MS. KWUON:  Sure.

 2                MR. KELLY:  So to be clear, I think

 3    that Ms. Kwuon is responding to our first bullet

 4    point there, which is confirming these are the

 5    complete files.  Our reading of what you sent over

 6    had suggested that maybe there was an external

 7    investigation report or an explanation of why an

 8    investigation was not conducted, because we did not

 9    see a writing like that or recognized something like

10    that within the exemplar that you provided, and it's

11    my understanding those are required.

12                So that was the confusion in terms of

13    that specific first bullet, the completeness issue.

14    And it might just be an disagreement about -- I

15    mean, I wouldn't be shocked if plaintiffs and

16    defendants disagree on what an adequate

17    investigation or explanation is.

18                The second bullet relates to the

19    source files issue.  I know that early on, you know,

20    defendants had claimed that because there were these

21    linked source files that impacted the formats in

22    which TrackWise data could be produced.  Did the

23    exemplars that you guys produced, did those have

24    linked source files?  Like, are these exemplars that

25    would be impacted by that issue?
```

September 14, 2021

```
 1              JUDGE DICKSON:  This is the question
 2   I had, Mr. Kelly.  You asked that question.  Did you
 3   see something in the exemplars that you examined
 4   that indicated that maybe there were links, or the
 5   links were taken out?
 6              MR. KELLY:  There were attachments at
 7   the end of the exemplars.  But there was -- but I
 8   guess within exemplars.  The form would end, and
 9   there would be a cover sheet and a new document
10   within the same PDF.  The question is, are those the
11   source files that defendants are talking about, or
12   have we not yet encountered an example on an
13   exemplar that has that problem with it?
14              JUDGE DICKSON:  That's a more
15   specific question.  Ms. Kwuon, may I please, and I'm
16   sorry to overly direct, but answer that question, if
17   you can, Ms. Kwuon.
18              MS. KWUON:  It is my understanding
19   that the attachments are the source files that were
20   completely pulled.  So there's the product complaint
21   report and then there are all the associated
22   attachments in the PDFs and all of those were
23   completely pulled and provided to counsel.
24              JUDGE DICKSON:  Okay.  So the --
25              MR. KELLY:  The first and second
```

1  bullets then.  That is very helpful.  The issue then

2  is the third bullet, which I think is actually

3  something that if we handle it at the deposition, it

4  would be too late to handle, or it will require more

5  questions afterwards.

6            Essentially, the issue is that, as we

7  discussed, complaints that were entered into past

8  complaint management systems have been migrated into

9  TrackWise.

10            JUDGE DICKSON:  Right.

11            MR. KELLY:  Those predecessor systems

12  were not identical to TrackWise, or they would be

13  called TrackWise.  So the question is:  To what

14  extent, if any, do the data fields, the inputs and

15  outputs, or even just the operating procedures for

16  how you -- you know, what level of detail you put

17  into which field, when, whether it's a dropdown

18  things like that, these data fields presumably

19  changed over time at least to some extent.

20            Right now, all of the exemplars we

21  have are from the last six months.  They were

22  entered into the current version of TrackWise.  So

23  the question is -- we know now what it looks like if

24  you try to extract a complaint that was initially

25  entered into the current version of TrackWise.  What

1    we don't know is what it looks like if you try to

2    pull out data that was entered into EasyTrack

3    [spelling unconfirmed] or into Manman, later

4    migrated over into TrackWise, like do those reports

5    come out in exactly the same format, with the same

6    fields, or are some of the -- we're just -- I'm

7    familiar with database migration like this ending

8    with fields getting switched, moved, or eliminated,

9    or added.  And that's information we need, because

10   it's not the case that the only relevant complaints

11   in this action were added into TrackWise.  They were

12   relevant complaints in predecessor systems that have

13   migrated into TrackWise.

14              JUDGE DICKSON:  I understand that.

15              Ms. Kwuon, can you answer that

16   question?

17              MS. KWUON:  Those are the questions

18   that the witness is going to be able answer at

19   deposition.  I think that counsel sort of set the

20   schedule about when they wanted the depositions

21   taken.  These are being taken sort of first at bat

22   in the litigation.  There are probably, you know,

23   more things, for example, that we haven't produced.

24   That database with the actual fields yet.  That is

25   in progress.  That is going to happen after the

September 14, 2021

1    deposition of the witness later this month.

2                     And so for us, with regard to, you

3    know, what we are providing to the other side, it

4    makes sense to us that the production has been as

5    complete as it can be to date right now.  I know

6    Mr. Cohen is going to provide additional information

7    about some of the SOPs, and the witness is going to

8    be able to answer these questions at his deposition.

9                     JUDGE DICKSON:  My only concern --

10                    MR. KELLY:  Oh, I'm sorry, Your

11   Honor.

12                    JUDGE DICKSON:  Go ahead, go ahead.

13   And then I'll tell you what my only concern is.  Go

14   ahead.

15                    MR. KELLY:  My concern is just that

16   this is sort of an inherently written visual thing,

17   and it seems unlikely to me that if we asked any

18   deponent, even if they're extremely familiar with a

19   predecessor ESI storage system platform, that they

20   would be able to rattle off every single data field

21   off the top of their head and identify which have

22   changed between the system they're remembering and

23   TrackWise.

24                    I think that a much easier way to

25   frame that conversation would be with a document

September 14, 2021

```
 1   that shows what the report looks like, and say, did
 2   this field exist, does that field exist, how are
 3   they different across the two systems.
 4               JUDGE DICKSON:  Well, you have that
 5   first document.  What you don't have is an exemplar
 6   from pre-TrackWise --
 7               MR. KELLY:  Exactly.
 8               JUDGE DICKSON:  -- or an exemplar of
 9   TrackWise that has data that had to be migrated
10   over.
11               MR. KELLY:  Exactly.
12               JUDGE DICKSON:  That's what you need.
13   Well, that should be easy enough, I would think.
14   That's number one.  I also agree with Judge Harz, it
15   seems to me it's very important to have someone,
16   whoever the deponent is, to have a computer in front
17   of them if they need to show you at the deposition
18   what the difference in the fields are.  Because I
19   get your question, I understand, and I think it's
20   correct.  Now, I don't think this should be very
21   hard.
22               Ms. Kwuon, can't we get them an
23   exemplar that has migrated information in it?
24               MS. KWUON:  So let me go back and see
25   what we can pull with regard to a pre-TrackWise
```

1  product and complaint, and I will report back to the

2  Court.  So let me look into that.

3                 JUDGE DICKSON:  I don't know if you

4  have to report back to us.  If you can just put that

5  into -- whatever it is.  I mean, it's a fair

6  question because -- now I'll express what my concern

7  is.

8                 My concern is that we go through this

9  exercise, and then you produce thousands if not

10  millions of documents, and then as they read them

11  and they start to get ready to depose the custodians

12  or the -- or not even the custodians, but the fact

13  witnesses from Allergan, it turns out that there was

14  information that no one was able to track down

15  because we didn't fix this first.

16                 So I'm saying this for a reason,

17  because I am sympathetic to the discovery on

18  discovery issue, but this seems to be something we

19  need to nail down before we start massive amounts of

20  substantive discovery, so that we don't have to stop

21  that and go back and do some things again.

22                 And I think with these simple

23  questions -- to me they are simple.  The answers may

24  not be simple, but I think the questions are

25  simple -- we may be able to avoid that stop and go.

September 14, 2021

```
 1   I mean, old war stories sometimes help.  This is a
 2   very short one.
 3                Patent case.  We were at the end, and
 4   then they started to fight.  And I found out -- it
 5   was a case that I took over, so it's not my problem,
 6   but I found out that they never sat down and defined
 7   the search terms and custodians before they produced
 8   massive amounts of information.
 9                If we can just -- this is akin to
10   that in my view.  If we can make sure we know what
11   we're producing and how we can review it, then we
12   won't have a problem later.
13                MR. KELLY:  I know in the joint
14   update letter, defendants had complained there were
15   not MDR numbers provided.  We have since sent over,
16   I think it was late last week, a list of MDR
17   exemplars that we could use if there was an issue
18   with selection there.  So we've provided those.
19                JUDGE DICKSON:  Okay.
20                Judge Harz, did you have anything
21   else on that?
22                JUDGE HARZ:  I see what you're
23   saying.  Plaintiffs have not yet provided the
24   additional medical device reporting information they
25   indicated they would, so that is all done.
```

```
 1                    MR. KELLY:  Yes, by letter.

 2                    JUDGE HARZ:  I have a question mark.

 3     So I can delete that.

 4                    Okay.  So just in terms of an order

 5     that comes out of today's conference, with regard to

 6     turning over an exemplar of an adverse event report

 7     pre-TrackWise, when can we do that?

 8                    MS. KWUON:  How about the same

 9     date of the -- was it the 22nd that we set?

10                    JUDGE HARZ:  Okay.  Right.  That is

11     the recertification.  Okay.  September 22nd, it's

12     going to be a pre-TrackWise -- how should I phrase

13     that?  How should we phrase it?

14                    MR. KELLY:  Your Honor, there were

15     actually multiple predecessor systems.

16                    JUDGE HARZ:  I know.

17                    MR. KELLY:  So I was going to say

18     EasyTrack and Manman.

19                    JUDGE HARZ:  Okay.  I need the

20     wording.  I need the wording, Mr. Kelly.  So by

21     September 22nd...

22                    MR. KELLY:  Exemplar complaint files

23     from the Manman and Easytrak systems, and

24     corresponding to the MDR numbers plaintiffs

25     provided.
```

1                    JUDGE HARZ:  And EasyTrack System --

2    Manman is M-A-N-M-A-N?

3                    MR. KELLY:  Yes.

4                    JUDGE HARZ:  And EasyTrack System

5    corresponding...

6                    MR. KELLY:  And corresponding to the

7    MDR numbers plaintiffs provided.

8                    MS. KWUON:  For clarification on

9    that, Your Honor, I think we can pull, you know, one

10   exemplar from each of the time periods, and use that

11   MDR number, select one from the provided the MDR

12   number.

13                   JUDGE HARZ:  Is that agreeable to

14   you, Mr. Kelly?

15                   MR. KELLY:  In full disclosure, I

16   wasn't the person who selected those MDR numbers.  I

17   know those were the MDR numbers you were interested

18   in.  I don't know what the additional burden is of

19   producing those other exemplars.  But we would want

20   all of those, is my understanding from people who

21   prepared those numbers.  But I mean, if that is not

22   feasible or --

23                   JUDGE DICKSON:  How many MDR numbers

24   were provided?

25                   MR. KELLY:  I think it was ten, but

1    let me double check that.

2                    MR. VESPERMANN:  This is Wyatt

3    Vespermann with Panish.  It was 13 total.

4                    MR. KELLY:  Thank you, Wyatt.

5                    Wyatt is our MDR number selector.

6                    MS. KWUON:  To be able to do a

7    compare, it seems to me that one exemplar from each

8    of the systems enables counsel to compare.  Again,

9    every additional thing is an additional thing.  So I

10   think we can provide one exemplar for that MDR pool

11   from the various time periods.

12                   JUDGE HARZ:  But aren't you just

13   pressing a button to print out 13?

14                   MS. KWUON:  No.  You know, just as we

15   -- I think when we started at the very beginning,

16   when we were going to make a production of product

17   complaint files and each of the attachments, there

18   isn't a single button.  It requires, you know,

19   finding the particular MDR and then going and

20   connecting to all of the different attachments, and

21   then pulling each attachment and converting it into

22   a PDF so that it can be provided.

23                   It's unfortunately not as easy as

24   just pushing ten buttons as opposed to just one.

25                   JUDGE DICKSON:  Well, let's do this.

1    Let's do three.  Let's do three.  And Plaintiff, you

2    identify the three you want her to do.

3                   MR. VESPERMANN:  Your Honor, if I

4    could just chime in.  This is Wyatt again with

5    Panish Shea & Boyle.

6                   It's not just the migration from the

7    old database.  There's certain adverse events, and

8    the way that Allergan has handled them differs, for

9    example, from the exemplars they provided.  So if a

10   device is returned to Allergan, they will do a

11   failure analysis, and so we want an exemplar that

12   shows what does the failure analysis complaint look

13   like, or if there was someone who was in one of

14   their clinical studies that developed ALCL, and

15   there's a couple examples of those, we want to see

16   how that complaint handling works.

17                  So it's not just the migration issue;

18   it does go a little bit further than that in that

19   not every complaint is the same.  And so that's why

20   there were 13.  It's not just migration from the old

21   system, but different, unique factual scenarios.

22                  JUDGE HARZ:  Okay.  I get it.

23                  JUDGE DICKSON:  It sounds more like a

24   substantive question than ECI, electronic data

25   question.

September 14, 2021

```
 1                    MS. GEIST:  Your Honor, can I just
 2      chime in on that, too, because I have been sitting
 3      quietly.
 4                    From our perspective, and we will
 5      comply with what Your Honor orders today, from our
 6      perspective, it is more of a substantive issue
 7      because I think plaintiffs would have in front of
 8      them the different iterations of the adverse event
 9      reports, right, that come from TrackWise, and before
10      that Easytrak, and before that Manman.  And
11      presumably, at a substantive deposition of a safety
12      person, somebody who can speak to how the company
13      records complaints as they come in, and that person
14      would answer questions about how things may have
15      changed over the various time periods.
16                    So -- and again, all of the ALCL
17      complaints and suspected ALCL complaints are going
18      to be provided, all of them, for the entire time
19      period we have been discussing.  So plaintiffs will
20      have all of that and then they can put the documents
21      in front of them and say, okay, clearly here there's
22      a change in how the company was reporting complaint
23      information as it comes in, if that is the case.
24                    So I understand.  You know, again, we
25      will comply with whatever Your Honor orders, but to
```

September 14, 2021

1    me this goes more to substance, and I assume

2    plaintiffs will have some questions about why

3    certain information was reported at various times,

4    or not.  I'm just making it up for purposes of this

5    argument.

6                    But it's more of a substantive issue.

7    Was there a change over time in the recording of the

8    complaints; and if so, why, and to what extent.  And

9    that goes to substance.

10                   MR. VESPERMANN:  I would push back on

11   that a little bit, Your Honor, because I think it is

12   a blurred line.  There is some ESI component to this

13   because it's how are all these documents linked

14   together, how does the failure analysis link to a

15   CAPA?

16                   And so this is how their data is

17   managed, is that one particular event coming in to

18   them from a complaint-handling perspective goes down

19   the line and to eventually, potentially, impacting

20   the manufacturing specs.

21                   And so how those things link together

22   is a huge question mark right now.  And it's not

23   necessarily substantive.  It's kind of a hybrid.

24   There's an ESI component to how these different

25   systems link together.

```
 1                    JUDGE DICKSON:  Okay.  I think if we
 2     answer all the questions you want, we're going to be
 3     definitely jumping into the substantive pool.
 4                    JUDGE HARZ:  Well, maybe allow for
 5     six and let the plaintiffs pick the six they want,
 6     instead of three, so you get a broader --
 7                    MR. VESPERMANN:  I'll take it, I'll
 8     take it.
 9                    JUDGE HARZ:  I don't know how much is
10     in -- you know, Judge Dickson and I are at a
11     disadvantage.  Ms. Kwuon says it's a big deal, the
12     plaintiffs are saying it's not such a big deal.
13                    Pick the six.  You're saying that you
14     don't know what the different complaint files look
15     like, depending upon the type of complaint.  Pick
16     the six you want, and then for the remaining eight
17     or seven, you know, if you show us a need, hey,
18     look, look at this, this is why we need the other
19     seven, we can address it.  Okay?
20                    MS. GEIST:  The only thing, again,
21     Judge Harz, I just want to make sure it's clear, the
22     other seven, the ALCL-related adverse event
23     complaints, all of them are going to be produced.
24     It's just what do plaintiffs really need?  What is
25     necessary to conduct this non-merit-based, you know,
```

1    non-substantive ESI-related deposition?  And from

2    our perspective, if it really is, we want to ask

3    somebody what is the difference between the adverse

4    event reporting during the Manman system, Easytrak,

5    TrackWise, that should be able to be accomplished

6    with three.

7                    JUDGE HARZ:  Well, I think the ALCL

8    reporting from the plaintiffs' perspective is very,

9    very narrow because there's so many other words and

10   so many other medical conditions they would want to

11   see with regard to reporting, because by the time

12   they use the actual language of ALCL, they are

13   beyond the point of whether they are concerned about

14   suspicions having been raised.

15                   So I don't think the ALCL reporting,

16   in and of itself, answers their questions.

17                   MR. KELLY:  It's our understanding

18   that defendant's ultimate production will include

19   confirmed ALCL cases, as well as cases with symptoms

20   consistent with ALCL, despite the lack of a

21   reference to ALCL.

22                   MS. GEIST:  Right.  We had agreed --

23                   MR. KELLY:  And against -- I'm sorry.

24                   MS. GEIST:  -- ALCL and suspected

25   ALCL.  Right.

 1                    But to Judge Harz's point, what I'm

 2    suggesting is these are substantive questions that

 3    will be presumably the subject of a deposition when

 4    we get to the merits.  We're just talking about an

 5    ESI-related deposition, and I think we just need to

 6    be clear it's limited to that.

 7                    And from what I've heard from

 8    plaintiffs' counsel is they would like to see one

 9    exemplar for each different system.  They are all

10    now in one system, and they would want to see, okay,

11    what did it look like when the Manman system was in

12    place, and what did the adverse event reporting, you

13    know, taken in by the company look like when

14    Easytrak was in place.

15                    So they have TrackWise, and they want

16    an example of a report from Easytrak and Manman.

17                    JUDGE HARZ:  Okay.  So then,

18    Plaintiffs, why are you saying it's more than that,

19    that you need more than that?  Why do you need more

20    than one from each?

21                    MR. VESPERMANN:  Your Honor, it kind

22    of goes back to what I said earlier that with

23    respect to these complaints, these different --

24    there's different obligations under the regs linked

25    together.  Right.  A complaint can lead to a CAPA

1    analysis.  And so regardless whether we're in a

2    particular system, whether it's TrackWise or

3    Easytrak, how these obligations link together have

4    changed over time.

5                   And so we just want to get a sense

6    of, for example, a failure analysis complaint.  When

7    something comes in that the device is returned to

8    the company, how does that process look like and how

9    do the systems connect.  And I think there's

10    definitely an ESI component to that because of how

11    this data is stored.

12                   MS. GEIST:  On that, Your Honor, I

13    don't want to overstep Ms. Kwuon, but on that, I

14    think, at a minimum, we need to meet and confer

15    about that because this issue about a device failure

16    and whether or not there was a device failure

17    analysis, our strong suspicion is there would be a

18    device failure analysis when there is a, let's just

19    say, a mechanical failure of the device.  So there's

20    been a rupture, or some other mechanical failure of

21    the device.

22                   The development of ALCL in a woman

23    who had the device implanted would be a complication

24    or an adverse event, but not necessarily a failure

25    of the device.  So if you think about a medical

 1   device, you know, if there's a rupture, that would

 2   be considered a failure.

 3              So I do think on that particular

 4   topic, I think that, you know, we should meet and

 5   confer on that because device failure, examples of

 6   device failure analyses are probably outside the

 7   scope of the ALCL litigation that we're talking

 8   about.  We're talking about ruptures and other

 9   examples of true device mechanical failure.

10              JUDGE HARZ:  Judge Dickson?

11              JUDGE DICKSON:  Well, for the limited

12   purpose of this deposition, I still don't see any

13   reason not to do what we're talking about doing,

14   whether it's three or six.  I understand what you're

15   saying, Ms. Geist, but if we go down that road,

16   we're going to wind up pushing the deposition out

17   and we're going to have briefing on whether or not

18   what the scope here is.

19              You will not be waiving your right to

20   argue scope at a later date if we can just get some

21   of these examples of exemplars done now so they can

22   at least understand what it looks like and how the

23   data was migrated from the earlier systems into

24   TrackWise, and whether or not a failure analysis of

25   a device will ultimately become something that they

1   get to look at through thousands of failure devices

2   we can talk about later.

3                JUDGE HARZ:  Okay.  So we'll go back

4   with the three, just for the purpose of having them

5   go forward with the deposition?  Is that your

6   suggestion, Judge Dickson?

7                JUDGE DICKSON:  No, I'm not.  I don't

8   understand what was wrong with six.  How much --

9                Ms. Kwuon or Ms. Geist, if they

10  identify six, I would say to the plaintiffs, if we

11  can give you six, they should be all different.

12  Let's not be redundant.

13                MR. VESPERMANN:  Absolutely,

14  absolutely, Your Honor.  They would be very unique

15  factual circumstances transcending the different

16  databases, and that's entirely the point.

17                JUDGE DICKSON:  And Ms. Kwuon, I get

18  it, it's going to be more work between now and then,

19  but how more work?  I mean, can you give me some --

20  I mean, is it -- is it -- tell me what we're talking

21  about here.

22                JUDGE HARZ:  Its only six, it's only

23  these six.

24                MS. KWUON:  So it really depends on,

25  for each particular one, again, how many ancillary

September 14, 2021

1    documents and datapoints are related to it.  So I

2    can't estimate the range.  Initially, when the

3    department was looking to this issue to pull the

4    1200 -- I think that was the number -- it was going

5    to take several months to be able to do that because

6    of each PDF pulled.

7                So what I might suggest maybe to

8    counsel is that if you want to give me the list of

9    six, perhaps rank them, we'll start with one, and

10   we'll try to get all six out to you by the 22nd.  If

11   for some reason there's a great burden and timing-

12   related issue, we will start with one and keep you

13   posted whether or not we can get all the way to six.

14   But I would suggest --

15                JUDGE HARZ:  And then maybe you can

16   get the remaining, if you can't get all six by the

17   22nd, you can get all six to them by the 27th, which

18   is the day before the deposition.

19                MS. KWUON:  Why don't you rank them

20   in order.

21                JUDGE HARZ:  Certainly get three to

22   them by the 22nd, and then maybe the other three by

23   the 27th to alleviate the pressure.

24                MS. KWUON:  Thank you.  That will

25   help.  And then of course, if we can get them all

1    out at the same time, we will do that.

2              JUDGE DICKSON:  And I'd like to have

3    kind of a fulsome meet and confer on this.  Once you

4    get three and you've looked at them, if you don't

5    need all six to get to the deposition, alert the

6    defendants to that.

7              MR. KELLY:  Certainly.  We will send

8    a ranked list very shortly.

9              JUDGE HARZ:  What's our next issue?

10             JUDGE DICKSON:  The beloved batch

11   records.

12             JUDGE HARZ:  Whoa.  Oh, I have a

13   question about the batch records.  Can I start with

14   a question?

15             JUDGE DICKSON:  You're a judge.  You

16   can do whatever you want.

17             JUDGE HARZ:  A question about a

18   sentence.  Okay.  Can everyone turn to page 5 of the

19   joint September 9 letter.  All right?  I'm going to

20   the first full paragraph that begins with

21   "Identification of Biocell devices distributed in

22   the United States."  The last sentence, I have a lot

23   of questions about it.  Is everyone with me?  I want

24   to wait.  Is everyone okay?  Can I see a nod?

25             COUNSEL:  Yes, Your Honor.

September 14, 2021

```
1                    JUDGE HARZ:  It starts with the
2     sentence, "Nor is it feasible."
3                    JUDGE DICKSON:  Yes.
4                    JUDGE HARZ:  "Nor is it feasible, as
5     Plaintiffs contend, for Allergan to use its device
6     tracking system to identify this information as that
7     system reflects information provided by the patients
8     to Allergan regarding their implanted breast implant
9     devices, and thus does not necessarily capture every
10    patient who was implanted with a Biocell device as
11    not every plaintiff provides their device
12    information to Allergan."
13                    I have a couple questions.  Because
14    if it's not feasible because not every plaintiff
15    provides their device information, that's a
16    non sequitur.  I mean, what you're basically saying
17    is you don't believe every patient provides that
18    information.
19                    But my question is, does the
20    plaintiff provide the information or does the
21    implanting physician or the hospital, or someone
22    else provide the information?  Is it really the
23    individual plaintiff?
24                    MS. KWUON:  The information is
25    typically contained within the medical records.  So
```

1    when the device is ordered, and it's different

2    depending upon a large practice or a small practice

3    or a hospital, but when the devices are ordered and

4    then delivered to the hospital, once we make that

5    delivery, we don't know what exactly happens to the

6    devices as to who actually receives them.

7              So the device, the serial number for

8    that finished device is generally and supposed to be

9    included within the medical records for tracking

10   purposes, and that information is generally expected

11   to be provided back to the company for our device

12   tracking.  And so that's sort of like the way you

13   would register if you purchase a blow dryer, you

14   know, so that the company can let you know if

15   there's some kind of an issue with it.

16             But that loop doesn't always happen,

17   and so that there isn't an ability for us to go find

18   and track all of that.  We have to wait for that

19   information to come back to us so that then we can

20   connect those dots on our side.

21             JUDGE HARZ:  But some have -- I

22   acknowledge from this sentence that you're saying

23   not every time is that information provided to you.

24   But I'm assuming, I don't know a percentage, but why

25   wouldn't that be a starting place?

1                    MS. KWUON:  Well, so we have the --

2                    JUDGE HARZ:  Device tracking system,

3      yeah.

4                    MS. KWUON:  Sure.  So when we do get

5      the information, we have the loop on any particular

6      serial number was implanted in a particular patient,

7      so we've got that information.  But that doesn't

8      take us back all the way to the batch records.  So

9      the batch records, as we tried to explain in our

10     documentation, the system is intended to track the

11     devices as they're being manufactured, but not

12     intended to work backwards.  So the backwards part

13     of it is more of a -- sometimes I call it reverse

14     engineering, which is you have to take the serial

15     numbers and then go trail back.

16                    So one of the questions that came out

17     of the last hearing was, can we isolate batches

18     where devices actually were implanted in US patients

19     only.  And so the answer to that is, no, we can't do

20     that at the batch record level.  You have to take

21     all the individual serial numbers and work backwards

22     to the batches.

23                    So we were trying to convey both that

24     the serial number information we have for implants

25     is incomplete, we know that to be true, and then it

1    doesn't take you to where we started, which is

2    isolate batches that were ultimately only delivered

3    to US patients only.

4              JUDGE HARZ:  I think Judge Dickson

5    was reviewing some of the batch records you gave to

6    us as Exhibits 5.  Judge Dickson, didn't you have

7    some questions about that?

8              JUDGE DICKSON:  What I would like to

9    know is why are the batch records -- this is going

10   to sound like a really naive question, but why are

11   they so important?  Because what I'm reading in the

12   batch records are basically quality assurance

13   reports.  This was done, that was done, this was

14   done, that was done.

15             Now, I confess, I did not read all

16   104 pages, but I read half of it.  So this question

17   is probably directed to the plaintiffs.

18             What is it that -- why do we need all

19   those?  What's in there that is going to be critical

20   to your case?

21             MR. SLATER:  Thank you, Your Honor.

22   It's Adam Slater, for the record.

23             To answer your question, I want to

24   step back one step before the manufacturing batch

25   records became the issue raised by the defense,

1    frankly.

2                    What we asked for was the

3    manufacturing records that would show the quality

4    evaluations and the outcomes of those quality

5    evaluations, and anything that they -- we don't know

6    all the records they maintain, so we're at a bit of

7    a loss because we have to accept from them, from

8    Allergan, what they say they do.

9                    But we need to be able to track:  did

10   they do those activities that Your Honor just

11   referenced; did they actually check off that these

12   products met their specifications, number one; were

13   there any deviations; what was done in response to

14   that; and, more important -- or maybe not more

15   important, but just as important, we need to see

16   what they were doing because they should be doing

17   some random sampling.

18                    I think they've already acknowledged

19   they take photographs, and there may even be video,

20   I'm not sure, but I believe they've said they're

21   going to be producing photographs so we're going to

22   be able to see, hopefully, whatever issues they

23   found that they documented and recorded.

24                    So we're looking for the

25   manufacturing records that would let us know, what

1    did they do and what were the outcomes and what's

2    the information because, for example, there may be

3    issues that are shown by their manufacturing records

4    that weren't picked up on by Allergan or weren't

5    focused on that we and our experts look at and say,

6    this is actually really an important point of

7    departure where it shows why this got through or

8    what the problem was.

9              So we need the manufacturing records

10   for all the devices that were sold in the US because

11   we need to be able to track all of the manufacturing

12   activities and all of the manufacturing quality

13   activities.

14             Frankly, Your Honor, what you're

15   looking at sounds mundane and sounds like, well, why

16   would you need to see that people were checking

17   boxes, but if it turns out that they were checking

18   boxes and the actual finished product wasn't

19   complying, or in the reverse, boxes weren't being

20   checked so quality reviews weren't being done, that

21   would be very important information, and we need to

22   be able to confirm that up front.

23             For example, if you looked in that

24   exemplar and you saw that a bunch of boxes weren't

25   checked where they're supposed to be checking the

 1   external textured surface for certain categories of

 2   defects, that probably would have popped out to you

 3   pretty strongly to say, wow, they didn't even look

 4   at this, they didn't check it off.

 5              So that's why we have to have a full

 6   set of records, not a smattering, not a sampling,

 7   and we need to be able to see that information.

 8              I hope that responds to your

 9   question.

10              MS. GEIST:  Judge, can I respond

11   briefly to that?

12              JUDGE DICKSON:  Sure.

13              MS. GEIST:  I feel very, very

14   strongly that we need to sort of reset and refocus

15   on what plaintiffs' claims are, because Your Honor

16   said, Why do you need all this?  What do you really

17   need? and the answer is, You don't need any

18   manufacturing batch records other than for the

19   plaintiffs who filed complaints because these are

20   manufacturing defect claims.

21              So for every single individual

22   plaintiff, she needs to identify in the record where

23   her device did not conform, was out of compliance

24   with the specifications for the product.  That's

25   manufacturing defect 101.  And those are the claims

1    in this case.

2              It is not a design defect case

3    because that would be different and that would have

4    been preempted.  And I hate to say preemption,

5    because we had very long briefing and argument on

6    preemption, but the plaintiffs had to argue they are

7    not arguing design defect because that would have

8    been preempted.  So their claims are manufacturing

9    defect.  They need to stick to their claims.  And

10   what that means is every individual plaintiff, the

11   documents that are associated with her particular

12   device are the only relevant documents with respect

13   to manufacturing.

14             JUDGE HARZ:  Why is that true?

15             MS. GEIST:  And in addition -- in

16   addition -- Your Honor, I just wanted to finish my

17   thought.  In addition to those manufacturing-related

18   documents for each individual plaintiff, we will

19   also provide all of the CAPAs, and that's the

20   Corrective and Preventative Actions, that arise out

21   of any non-conformities identified during the

22   manufacturing process.

23             And that's sort of a, let's just say

24   a global production, that's not specific to any

25   particular plaintiff, but a medical device company

```
 1   will have a CAPA for any time they have identified a
 2   nonconformity during the manufacturing process.
 3              But again, I think this is a major
 4   dis --
 5              JUDGE HARZ:  Mr. Slater, why is what
 6   Ms. Geist saying not true?  Why do you need for
 7   everything and not only the plaintiffs?
 8              MR. SLATER:  Well, to begin with,
 9   Your Honor, this is not just an individual personal
10   injury litigation.  There's also class actions that
11   encompass everybody that was implanted with these
12   devices in the United States.  So our claims aren't
13   limited to these individual plaintiffs, number one.
14              Number two, manufacturing defect
15   cases can often rest on patterns that emerge over
16   the course of many documents across entire lots.
17   They may have evaluated one or two devices in the
18   lot that plaintiffs happened to have had the
19   implants in, but there's 12 other devices or 14
20   other devices in that lot.  When you look at the
21   entirety of the records, you'll see trends and
22   you'll see patterns.
23              And frankly, the last thing that
24   counsel said about producing the CAPAs, that sounds
25   great, but those come into play when they recognize
```

1    the problem.  There's a very good possibility that

2    they didn't recognize this problem, and it's going

3    to be up to us to take all of their documentation

4    and go through that meticulously to find the signals

5    in those records and the indications in those

6    records that these problems were recurring and they

7    were being missed.

8                I would hope that that would be the

9    case for Allergan's sake, that it would turn out

10   they didn't realize this was the problem and they

11   weren't catching it, because it's going to be much

12   more damaging to them if it turns out they knew

13   there was a problem and they were ignoring it with

14   the textured surfaces, if it turns out that that's,

15   you know, based on their records and based on all

16   the discovery that's where the problem is, and

17   that's where our case is right now, obviously.

18                So I hope that responds to your

19   question.

20                JUDGE HARZ:  Okay.  So the defendants

21   say, hey, class action, you're only entitled for the

22   class representative.  You don't get, you know, the

23   entirety of everything that's out there.  It's just

24   for the named class representative.  That's what

25   they say.

```
 1                    MR. SLATER:  I don't think that's

 2    true because what we're looking to do is we're

 3    attempting to establish class-wide claims and we are

 4    representing the entire class.  So, yes, there's

 5    individual plaintiffs who have claims, but we have

 6    the absolute right to present evidence that goes

 7    beyond the individual plaintiff.  I mean, I don't

 8    think that the defense is suggesting if we were to

 9    try the class case on the manufacturing defect

10    claims that we would be precluded from producing

11    manufacturing records for patients other than the

12    named plaintiffs.

13                    I mean, you can do this class action,

14    conceivably, for -- with, let's say, for one state

15    with one plaintiff.  I'm trying to simplify this.

16                    JUDGE DICKSON:  But we're not, but

17    we're not, and that's where I want -- I kind of want

18    to go there.

19                    How many named plaintiffs do we have?

20    Not representative plaintiffs, because -- don't we

21    have -- how many complaints have been filed?  I've

22    lost track.

23                    MS. KWUON:  We're at 1,040, so that's

24    about 900-plus in the MDL, 65 named class

25    plaintiffs, and then that puts it less than a
```

September 14, 2021

```
 1    hundred in terms of any other jurisdiction.  So
 2    there's 65.  I believe it's 65 named.
 3                   JUDGE DICKSON:  65 named class
 4    plaintiffs, class representatives.
 5                   MS. KWUON:  Yes, out of 1,040 total.
 6                   JUDGE DICKSON:  And the rest are
 7    individual manufacturing defect plaintiff claims.
 8                   MS. KWUON:  Right.
 9                   JUDGE DICKSON:  Okay.  Judge Harz and
10    I have talked about this.  For starters, for
11    starters, why can't we just -- and I'll get back in
12    a minute to Mr. Slater's answer about the batch
13    records, which I asked -- but for starters, why
14    can't we at least get all that information produced,
15    all that, the 1,040 produced?
16                   MS. GEIST:  We're not disagreeing.
17                   JUDGE DICKSON:  And I know you're
18    not, I know you're not, so let's at least -- I'm
19    sorry.
20                   MS. GEIST:  It's a lot of paper, Your
21    Honor.  It's like a hundred -- I think it's a
22    hundred pages per --
23                   JUDGE DICKSON:  A hundred thousand, a
24    hundred thousand.
25                   MS. GEIST:  -- [overtalking] process,
```

1   it's a lot of paper.  I mean, this is significant.

2   So I would suggest a sampling, you know, any type of

3   sampling the plaintiffs are really looking for with

4   the significant volume that we already agreed to

5   produce, which is squarely relevant and responsive

6   to their manufacturing defect claims.

7              JUDGE DICKSON:  I get it, but what is

8   the schedule for produce -- let's say, in my case --

9   not in my case, I order that now.  What's the

10  schedule?  What is an appropriate, reasonable

11  schedule to get all of the batch records produced,

12  plus all of the CAPAs?

13             Now, I just want to make sure I

14  understand this.  You say also you would not confine

15  the CAPAs to the plaintiffs, that would be all

16  CAPAs.

17             JUDGE HARZ:  All CAPAs.

18             MS. KWUON:  Right.

19             JUDGE HARZ:  All CAPAs.

20             MS. GEIST:  Right.

21             JUDGE DICKSON:  I'll tell you what.

22  I'm not just interested in getting a lot produced

23  for no good reason.  This whole issue of the class

24  and what's discoverable in class discovery, whether

25  we do merits or class discovery, I don't think we've

1   defined.  We don't have a schedule.  We haven't set

2   forth any parameters.  And when I say "I don't

3   think," I know we haven't.  So I do want to get to

4   that, and I was hoping we could start the discussion

5   today, but I don't think we can finish it today.

6              But before we get there, because

7   Judge Harz and I had a couple of discussions about

8   this, we're all in agreement that you're at least

9   going to produce all the batch records for the named

10  plaintiffs, the class representatives plus all the

11  individual plaintiffs.  So what's the schedule to

12  get that done?

13             MS. KWUON:  Sure.  So as is in the

14  declaration of Mr. Rodriguez, who is director of

15  quality at the manufacturing facility in Costa Rica,

16  that was the -- which was included in the most

17  recent one we submitted --

18             JUDGE DICKSON:  I saw it.

19             JUDGE HARZ:  We have it.  We have it,

20  yes.

21             MS. KWUON:  And as you can see from

22  the exemplar batch records, it is, you know, lots of

23  handwritten notes and depending on time, but that

24  estimation is six hours per batch record, to go back

25  and manually pull, in many instances, from storage

1    the actual records requested here.

2                    So it's estimated at six hours per.

3    If you take, let's say, 1,000 plaintiffs, that gets

4    us to 6,000 hours, 750 work days, eight hours a day,

5    you know, Monday through Friday.  If it's one

6    employee full time, it could take as much as 750

7    days, which is three years.  If it's two employees,

8    it's a year and a half.

9                    I don't know if that actually is

10   going to hold true all the way to end, or if there's

11   going to be some increased efficiency.  So my

12   suggestion might be, if we start with, let's say, I

13   don't know, 10, we will pull and time and get a

14   better idea of what it is going to take to pull each

15   one.  We're going to need the finished product

16   serial number from plaintiffs or plaintiffs' medical

17   records, but we can start there.  And then I think

18   once we get an a sampling or a test run, we can then

19   project out to the Court what it will take to do the

20   rest of the thousand.

21                    JUDGE HARZ:  Well, no, I mean, I

22   think that -- listen, I don't know what the work

23   force is like in Costa Rica, but it would seem to me

24   as though, as in other litigations, the company is

25   going to have to hire, whether it be plaintiffs or

 1    defendants, very often in litigations you have to

 2    hire other people to support what is needed in the

 3    litigation.  It would seem to me as though you would

 4    need -- you'd maybe have to hire some people to do

 5    this work.  I mean, we can't wait two years for

 6    these batch records for these named plaintiffs.

 7                     So I don't know how many people that

 8    would be.  Maybe it's 10, maybe it's 15, maybe it's

 9    20.  But they have to hire more people to get this

10    information to them.

11                     MS. KWUON:  Right.  I think I was

12    just trying to give an order of magnitude, but no

13    doubt that's correct.  What I'm going to suggest is

14    we start with ten or a dozen, plaintiff gives us

15    serial numbers, we have them working, clock it, and

16    then we will be able to better project what it will

17    take to finish one.

18                     JUDGE HARZ:  I think what Judge

19    Dickson and I are looking for is, aren't we, Judge,

20    just a date.  When we -- I guess maybe we're putting

21    you on the spot and you have to talk to people and

22    you have to find out who else you're going to hire.

23    We need a date when the named individual plaintiffs,

24    whether it be in state or federal court, as well as

25    the class, when their batch records can be produced.

1    I man, everyone agrees that has to be done, so we're

2    not even fighting over that.  Now it's a question of

3    the date.

4                MS. KWUON:  So we can do that, and I

5    think also the trigger point of that would be when

6    we have a serial number, so --

7                JUDGE DICKSON:  I'm sorry for

8    interrupting you, Ms. Kwuon.  I hear you.  I hear

9    you.  But why -- can I suggest you meet and confer

10   with Mr. Slater or whoever Mr. Slater puts up with

11   you on this issue within -- and get us a joint

12   status letter within ten days as to -- to see -- to

13   talk about who needs to do which job and how long it

14   will take that side to do that job, and then do --

15   and then to hopefully agree.  And assuming that you

16   don't agree, tell us, each, in the letter what your

17   positions are, and then Judge Harz and I will decide

18   how to cut the baby.

19                MS. KWUON:  Okay.

20                JUDGE DICKSON:  Great analogy, great

21   metaphor.

22                JUDGE HARZ:  Okay.  So I have written

23   down the number 1,040.  Is that an approximate

24   number of batch records we're talking about right

25   now that we're looking for a date of production for

```
 1   named individuals?  Is that number correct, 1,040?

 2                 JUDGE DICKSON:  That's how many

 3   plaintiffs.

 4                 JUDGE HARZ:  Are my numbers right?

 5                 MR. SLATER:  I'm not sure if that

 6   included the MCL, also, Janet.  I'm not sure if you

 7   included the New Jersey litigation in that count.

 8                 MS. KWUON:  I believe it did, but we

 9   can go back.  That's my general understanding, but

10   we can go back and check numbers.

11                 JUDGE HARZ:  And I think, and I might

12   be confusing my cases, aren't there also cases --

13   are there cases in California on this one?

14                 MS. KWUON:  There are.

15                 JUDGE HARZ:  Yeah, okay.  So then the

16   universe of cases.  I think that's what we need to

17   know, right?

18                 JUDGE DICKSON:  Yes.

19                 MS. KWUON:  We'll factor that in.

20                 MR. CARSON:  Your Honor, this is

21   Shanon Carson.  There are also many cases that are

22   subject to a tolling agreement between the parties,

23   so I think that needs to be factored into this

24   discussion.

25                 JUDGE HARZ:  How many?  How many?
```

1                    MR. CARSON:  Dave, do you know the

2    exact number?

3                    MR. STANLEY:  Yeah, I do.  Yes.

4                    Good morning, everybody.  David

5    Stanley from Reed Smith for defendants.

6                    We have, if you count the foreign

7    claimants, we have over 6,000 tolled claimants, so

8    -- and that would complicate things significantly if

9    we were factoring those in.  So I think we should

10   probably try to stick to what we have on file, at

11   least at this point.

12                    JUDGE HARZ:  Did you say foreign

13   claimants?

14                    MR. STANLEY:  Yeah, there are a

15   number of citizens of South Korea who have entered

16   into a tolling agreement.  We haven't necessarily

17   agreed that if -- once the tolling agreement expires

18   that we would -- that we would allow them to come

19   into the United States to file claims without

20   objection.  But at least at this point, those claims

21   are tolled.

22                    If you take those out of the

23   equation, I would have to go back and check my

24   charts to see, but out of the 6- or 7,000 tolled

25   claimants, probably over half of them are from South

1    Korea.

2                   JUDGE HARZ:  And the country of

3    implant was?

4                   MR. STANLEY:  I don't understand your

5    -- you mean -- oh, no.  South Korea.  So these are

6    South Korean plaintiffs who were implanted in South

7    Korea.

8                   JUDGE HARZ:  Okay.  Thank you.

9                   MS. GEIST:  And again, I just wanted

10   to note, the vast majority, I think, of the

11   plaintiffs who have filed and then the named

12   plaintiffs, the vast majority of plaintiffs are

13   women who have not been diagnosed with ALCL.  So

14   that's a very --

15                  JUDGE HARZ:  Right.

16                  MS. GEIST:  -- rare condition, so

17   some consideration might be given to the differences

18   among the plaintiffs.

19                  JUDGE HARZ:  Thank you.

20                  JUDGE DICKSON:  In terms of the class

21   actions, are there -- I went back and I was looking

22   at Judge Martinotti's opinion, and he deals with a

23   medical monitoring class.  Are there any other

24   proposed causes of action in the complaint that were

25   not brought up on motion, other than medical

September 14, 2021

 1   monitoring, for a class action?

 2              MR. CARSON:  Yes, Your Honor.  There

 3   are extensive causes of actions that are pleaded in

 4   the class action complaint, including causes of

 5   actions for breach of warranty, and causes of action

 6   for violation of state consumer protection statutes,

 7   and there -- it's a complaint that, if I remember

 8   correctly, is over 1200 pages, most of which is

 9   causes of action individually listed for each

10   jurisdiction.  And so there -- there is a lot there.

11              JUDGE DICKSON:  I really -- Judge

12   Harz and I started this conversation.  And Judge, I

13   apologize.  The more I thought about it, the more I

14   realized how well I wanted to focus, so I haven't

15   had a chance to tell this to you to get your take on

16   it.  So you can slap me back as much as you need to.

17              But before I'm going to be

18   comfortable making a final decision on what batch

19   records or any other manufacturing records that we

20   haven't even discussed, if there are any, should be

21   produced in the federal action, I need the parties

22   to do what they normally do, and that's tell me in a

23   joint discovery plan what discovery -- what's

24   relevant discovery for these causes of action,

25   because there are issues as to --

September 14, 2021

```
 1                    I mean, normally, we all know you
 2   don't take discovery from putative claimants, and so
 3   -- and I think Ms. Geist has made that point and I
 4   agreed that is a point to be considered.  But I
 5   heard what Mr. Slater said today, too.  But I need
 6   to know how this discovery that you're seeking
 7   relates to the causes of action in the class, the
 8   class action cases.  Not in the individual cases.
 9   That's easy.
10                    MR. CARSON:  Your Honor --
11                    JUDGE DICKSON:  But in the -- but in
12   the individual cases, we've already told you you
13   have to turn over all the batch records for the
14   individuals, so that's not really an issue.  I'm
15   talking about the class action.
16                    MR. SLATER:  I think what might be
17   getting lost, Your Honor, is that there's a
18   manufacturing defect claim obviously in the class
19   actions, which is the basis for the remedy of
20   medical monitoring for states that consider it to be
21   a remedy as opposed to a --
22                    JUDGE DICKSON:  Okay, okay.  So
23   that's what I assume, but I need for the parties to
24   relate the discovery that would be irrelevant for
25   class discovery.  And that's the other issue.  We
```

September 14, 2021

1    haven't talked whether we're going to do class

2    discovery and merits discovery at the same time, or

3    whether we're going to do class discovery first.

4    And I know sometimes it's almost impossible to

5    separate them, or at least it's difficult.  And we

6    need to talk about that, I think.

7                  MR. CARSON:  Your Honor --

8                  JUDGE DICKSON:  At least from my

9    perspective, we have to.  We have to do both.

10                  I'm sorry, Shanon.  I didn't mean --

11                  MR. CARSON:  No, I was going to say I

12    completely agree, Your Honor.  This wasn't teed up

13    as an issue for today's conference, but we will meet

14    and confer with defense counsel and do what exactly

15    what you're suggesting, and I think defense counsel

16    would agree with this, as well, and tee up these

17    class discovery issues for the next conference.

18                  JUDGE DICKSON:  Ms. Geist, you agree

19    with that, right?

20                  MS. GEIST:  I'm sorry, Judge.  I was

21    nodding.  Yes, of course, we're happy to meet and

22    confer and discuss it, and we can certainly discuss

23    it at the next conference.

24                  JUDGE DICKSON:  So, for this

25    conference, though, and then there's one other issue

1    Judge Harz, that you and I talked about because I

2    still don't understand why we cannot find out.  I

3    understand what you're telling me, defense counsel,

4    as to why it's impossible -- not impossible -- I

5    think "feasible" was part of that sentence that was

6    contained in the paragraph where you were, I think,

7    pushing back on the idea of determining which --

8    connecting the batch records for the products that

9    were shipped into the United States.

10                   And I get that from that perspective,

11   because it's all on paper and you have to reverse

12   engineer and everything, but let me try another idea

13   which I mentioned to Judge Harz.

14                   Why can't you go to the Allergan

15   sales people, department, whatever we want to call

16   it?  I mean, those are the ones that ultimately

17   would have sold the devices in the United States,

18   the United States Allergan sales people, assuming

19   they have a sales department for every country.

20   Even if they don't, why would not the sales

21   department have records on what they sold in the

22   United States over the last 30 years.

23                   MR. SLATER:  Your Honor, it's -- I

24   think it might not even -- I think sales would know,

25   obviously, but there's actually an arm of the

1    company, I would assume, that is a production arm,

2    and I'm using "production" generically, that is

3    involved in overseeing all of the shipping.

4                   If they send a product anywhere, they

5    track it.  They have paper or they have electronic,

6    and they know exactly every device where it went.

7    They have to know that.  So they know every device

8    that went to the United States.  They have to.

9                   JUDGE DICKSON:  Well, Mr. Slater, you

10   should understand that I want to know this because

11   I'm trying to determine whether or not we can reduce

12   the magnitude of some of the discovery.  You are

13   going to continue to argue, I assume, that you want

14   everything that Costa Rica touched.

15                  MR. SLATER:  No, no.  What we

16   actually said in the letter was this.  What we want

17   is the records for the lots from which product was

18   sold into the United States.  We have stepped back

19   from our position, and we thought it was a

20   significant compromise, from all of the

21   manufacturing records in the plant.

22                  What we've said is we'll accept the

23   lots from which product was sold to the US, because

24   they've told you, Well, we don't know what every

25   single product, exactly, if it was in plants or not,

 1   who it went to, but they know if products went from

 2   Lot A to the US.  If they sold three from that lot

 3   to the US and 17 to France, we are asking for that

 4   lot.

 5              That way it makes it simpler for them

 6   to identify the lots.  And we've taken a big step

 7   back from what our initial ask was.

 8              JUDGE DICKSON:  Ms. Kwuon.

 9              MS. KWUON:  Sure.  So I guess to

10   answer the Court's question about the reverse

11   engineering, whether your --

12              JUDGE DICKSON:  I agreed with it.  I

13   understood it.  I'm not really asking why is that

14   so.  I got it.  I'm saying, why can't we do what

15   Mr. Slater just said?  In other words, forget Costa

16   Rica, or trying to get the information out of Costa

17   Rica.

18              MS. KWUON:  So it's two-fold.  One is

19   we have to start with the issue of whether or not

20   it's relevant to the case, and we start pulling

21   batch records for non-plaintiffs.  We have our

22   class-related argument that we're going to address,

23   it sounds like at the next hearing, with more

24   specificity.  And then we have the inordinate amount

25   of burden related to this particular kind of going

1    any broader than what we're doing here with regard

2    to the plaintiffs.

3                So just as we're going to get more

4    information to provide to the Court about how long

5    it's going to take even to do the 1,000-plus -- and

6    again, that early estimate was six hours per record

7    that we're pulling and tracing -- as it relates to

8    the batch records, the design history records, as

9    you can imagine, the records that follow start to

10   then trail off and become individual records to that

11   particular finished product.

12               So there isn't a commonality of a

13   common set of records that is going to apply all the

14   way to finished product.  So it still is a very

15   manual process.

16               When we're talking about manually

17   pulling records for batches and for devices that

18   didn't even enter the United States, we are talking

19   about three quarters of the production, devices that

20   were sent out globally and not in the US, we're

21   talking about multiplying all of those things, the

22   six hours per batch record, the number of hours it's

23   going to take to pull that manual pull, the

24   exponential level that has -- and we've looked --

25   never been ordered is above and beyond what we're

1    talking about here, which are the plaintiffs that

2    are at issue.

3              So what we would like to do is what

4    the Court is suggesting, is start with a set, run

5    through the whole process, get very precise metrics

6    about time and burden.  We can extrapolate from

7    there what it will take to do over a thousand

8    plaintiffs and their batch records, and then it

9    makes sense, at least to us, to then pause as we

10   address the scope of discovery relative to putative

11   class plaintiffs.

12             JUDGE DICKSON:  Okay.  But I'm

13   interested in getting an answer to Mr. Slater's

14   question.  And maybe you're right, maybe it comes in

15   the discussion about the scope, but I think -- I

16   want to know how we can track what was brought into

17   the United States, from my perspective, which I can

18   reduce the scope for you, which Mr. Slater is

19   apparently agreeing to do.  Well, I shouldn't say

20   "apparently."  Which he has flat-out agreed to do.

21             MS. KWUON:  From what entered the

22   United States was implanted in a US patient, the

23   tracking on that is with the serial number.  So you

24   have to take --

25             JUDGE DICKSON:  I think you're -- I

1    don't mean to interrupt you, but I think you're

2    narrowing it down right now to the named plaintiffs.

3    Right?

4                    MS. KWUON:  No, no, to all -- to all

5    implants that entered into the United States with

6    the intention.  So what happens is that --

7                    JUDGE DICKSON:  So you're saying

8    Mr. Slater is wrong and there's not some corporate

9    department who knows what was brought into the

10   United States.  Whether they were implanted or not.

11   They could be sitting on shelves.  But I'm talking

12   about devices that come to the United States.

13                   MS. KWUON:  Okay.  So they sit in a

14   distribution center, and then when there is an order

15   for a particular type and size, those breast

16   implants are then sent to that location.  So the

17   distribution center does know what it is sending

18   when it receives orders.

19                   It does not have information there

20   that links it back to batch records.  To actually

21   link it back to batch records, you have to go down

22   to the serial number, just like we would need to get

23   from the plaintiffs, and then go backwards to find

24   the batch number.

25                   So there isn't a way to take the

 1   batch data of 280,000 batches and say, Oh, these are

 2   the ones that have less bound devices and these are

 3   only global.  Instead, you have to start with that

 4   serial number order in that distribution center and

 5   go backwards to see what batch that belongs to.

 6                  JUDGE DICKSON:  Okay.  I understand

 7   what you're saying now.  So you can identify what

 8   products were shipped into the United States, but

 9   you will not be able to link that with a batch

10   record until we have -- I got it.

11                  MR. SLATER:  Your Honor, just to be

12   clear because I don't want to have misled Your

13   Honor, if I did.

14                  What we're asking for -- and I see

15   where you're going, and we'll obviously abide by

16   whatever you do.

17                  We're asking for the lots from which

18   the product went to the US.  Not just the product

19   that went to the US, not just the records for those

20   devices, but for the full lots, because that's

21   actually easier for them to produce.  If they know

22   they shipped any product from a particular lot to

23   the US, that lot would be captured and they don't

24   have to do this production they're talking about.

25                  And I also will tell you, and maybe

September 14, 2021

```
 1   what it's time for Allergan to do is start producing
 2   their distribution center records and show us --
 3   have some transparency on what these records look
 4   like because I would be stunned if the distribution
 5   center records that say these 50 devices went to the
 6   US doesn't list the serial numbers and everything
 7   else.
 8              They have to be able to track forward
 9   and back, and we're asking them to track forward
10   now.  They said they can't reverse engineer, that
11   they can't do that.  They don't need to do that.
12   What they need to do is know what they sent and
13   where they sent it to, and they know that, and they
14   know it in the distribution records.
15              If their records don't reflect the
16   serial numbers of what product got sent to the
17   United States someplace, then they're saying there's
18   no way to link the products that went to the US to
19   where it was manufactured.  That would be
20   impossible, and the FDA would be very interested in
21   that.
22              MS. KWUON:  I feel like we're
23   speaking in circles.  I'm saying that the serial
24   numbers can't be identified from when they are
25   distributed.  I'm just saying that having that
```

```
 1  serial number doesn't take us back to being able to
 2  better sort identify the batches.  You have to take
 3  the serial number, trace, pull these batch record
 4  documents that has been provided to the Court to get
 5  you back to the batch.  This isn't a shortcut in
 6  trying to partition or parse out the different
 7  batches.  That was the only part I'm trying to --
 8            JUDGE DICKSON:  Okay.  Here's what
 9  I'd like, here's what I'd like.
10            Mr. Slater, can you give me a letter
11  that outlines where you are now, and I don't mean to
12  suggest that you're changing, but I think you did
13  say you reduced your --
14            MR. SLATER:  I think it's in the
15  letter we submitted, frankly, Your Honor.
16            JUDGE DICKSON:  Which letter?
17            MR. SLATER:  The January.  It should
18  be in there.  At least it was when I wrote it.
19            JUDGE HARZ:  It's on page 2, the
20  second to last paragraph:  "Plaintiffs offered to
21  compromise their request, without prejudice to
22  future requests, to accept the manufacturing records
23  for all lots and batches from which devices were
24  sold into the United States.  Defendants rejected
25  this position out of hand."
```

1                    It's on page 2, second to last

2    paragraph.

3                    JUDGE DICKSON:  Uh-huh.

4                    All right.  I'm sorry.  Does Allergan

5    tell me in here why they are rejecting that out of

6    hand?

7                    MS. KWUON:  Yes.  So if we go back to

8    -- so plaintiffs went from all global to --

9                    JUDGE DICKSON:  No.  Did you tell me

10   -- did you actually respond to that in this letter?

11   Because I'm looking at the letter, but apparently

12   I'm having trouble with a brain fart trying to

13   figure out which --

14                   MS. KWUON:  We did on multiple

15   fronts.  So the first section on class was based on

16   what is the appropriate scope of discovery.  The

17   second part of it was a discussion about how the

18   exemplar batch records, the hundred pages, is

19   representative of what you're going to extrapolate

20   back to 273,000 batches.

21                   JUDGE DICKSON:  Right.

22                   MS. KWUON:  Reducing down to US might

23   reduce the piece count by tens of millions, but it

24   doesn't reduce the amount of work in tracing back to

25   the batches.

1                    And then the last part of our

2    argument there had to do with what we're able to do

3    and the scope of what we're talking about with

4    regard to the 1,000-plus plaintiffs at hand here.

5                    So we did address it in the letter.

6                    JUDGE DICKSON:  I'm going to --

7                    MS. GEIST:  Judge, can I just say one

8    thing?  One thing.

9                    JUDGE DICKSON:  Yes, sure.

10                   MS. GEIST:  I think we did address on

11   multiple fronts, as Ms. Kwuon just articulated, at a

12   rock bottom, at rock bottom we're talking about over

13   a million devices sold in the United States.  So

14   that just translates.  What does that translate

15   into?  It's 130 million pages.  So I think, at rock

16   bottom, that is our argument, why we are saying no,

17   because it is wildly overbroad, it is not relevant,

18   and we have already agreed to turn over the

19   manufacturing batch records for over 1,000

20   plaintiffs, which will be at least 6,000 hours.

21                   So I would just say the sheer number,

22   130 million pages, I think more than demonstrates

23   the overbreadth of this argument on behalf of

24   plaintiffs.

25                   JUDGE DICKSON:  All right.  So Judge

September 14, 2021

```
 1   Harz and I will continue to discuss it, unless she's
 2   ready to rule right now.
 3                  JUDGE HARZ:  We will discuss.  We
 4   will discuss.
 5                  JUDGE DICKSON:  So let's move on to
 6   the organization tables.
 7                  JUDGE HARZ:  When are the CAPAs going
 8   to be produced?
 9                  MS. KWUON:  Those will be produced, I
10   would say, by like the second week of October.
11                  JUDGE HARZ:  Let's give it a date.
12                  MS. KWUON:  Let me look at my
13   calendar.
14                  JUDGE HARZ:  October 15th?
15                  MS. KWUON:  October 15th.  Thank you.
16                  MS. GEIST:  Your Honor, I have the
17   organizational information.
18                  JUDGE DICKSON:  Okay.
19                  MS. GEIST:  I did want to note, Your
20   Honor, I had designated 90 minutes or an hour and a
21   half for our conference, which I think is what we
22   had agreed upon, and with apologies, I have a hard
23   stop right before 1:00.
24                  JUDGE DICKSON:  That's all right.
25   Let's see if we can chainsaw this.
```

 1                MS. GEIST:  Your Honor, I can state

 2    very briefly, and I'm sure plaintiffs will respond.

 3    Very briefly, we've provided quite a bit of

 4    organizational information by the company.  I think

 5    Your Honor stated earlier, let's get to the merits

 6    discovery.  This is not merits discovery.  This is

 7    organizational information.  We have provided quite

 8    a bit in two separate letters to the plaintiffs,

 9    which we referred to and included in the index.

10                I'm not sure what the focus is.  We

11    have -- as a reminder to the Court and to the

12    parties, there was a stipulation put in place in

13    this litigation as to the proper parties, the proper

14    named defendants, so a lot of this focused on

15    corporate organization and structure seems to be a

16    little far along from the real issues.

17                We have provided and we will continue

18    to provide any organizational charts that the

19    company has and maintains.  We have communicated to

20    plaintiffs that historically Allergan and its

21    predecessors did not and were not required to keep

22    organizational charts.  There is not a central

23    location or a database for organizational charts.

24                I counted in preparation for today's

25    conference at least 119 organizational charts that

September 14, 2021

 1    we produced for Allergan, for McGhan and Inamed, the

 2    predecessor companies, and that this organizational

 3    information covered many, many different

 4    departments, including regulatory, marketing,

 5    medical, safety, quality assurance.

 6                    So we have produced what we have.  We

 7    will continue to produce or give custodial files if

 8    we find any other organizational charts.  But our

 9    position is there shouldn't be -- we shouldn't need

10    to do anymore.  We can only produce what we have.

11                    And I harken back to our last

12    argument about, you know, plaintiffs' request that

13    we put together charts of information.  There's no

14    obligation to do that, similar with the

15    organizational charts.  We have produced quite a bit

16    and we have complied with our obligations.

17                    So that's our position.

18                    JUDGE DICKSON:  Let's hear from

19    plaintiff.

20                    MR. SLATER:  I will cut to the chase.

21                    We're going to -- we would like to

22    send a 30(b)(6) notice, take a deposition of

23    corporate representatives.  I'm sure the Court is

24    weary, as we are, with lawyer letters going back and

25    forth with bits and pieces of the story being put

1    together.  I'm sure the Court has never seen such

2    difficulty in understanding the organization of a

3    defendant or defendants.

4                   So we would like to end the

5    letter-writing campaign.  We would like to depose a

6    30(b)(6) witness and put this issue to bed because,

7    from our perspective, we need this to have the

8    context, to understand the documents, to understand

9    who is who, to understand who matters, to know what

10   things mean, to understand which companies were

11   doing what, what departments did what.  Then we can,

12   when we go into the regular depositions of actual

13   fact custodians, we're not going to have to waste

14   deposition time asking organizational questions.

15                  So that's what we ask for, Your

16   Honor.  We would just like to move to the deposition

17   and put this issue behind us.

18                  MS. GEIST:  And we strongly disagree,

19   probably not surprisingly.  I do think that's

20   backwards.  I don't think I've ever been involved in

21   a litigation of this type where you had to give a

22   30(b)(6) up front on corporate organization.  At a

23   minimum, it comes to the defense via interrogatory.

24   I'm very familiar with that.  That might be an

25   appropriate vehicle.

September 14, 2021

```
 1                    But as the documents are produced,

 2    typically, it becomes very clear when you look at

 3    the documents.  Which, again, there's 115

 4    organizational charts in our production already.

 5    There's a lot of information there.  But as the

 6    documents continue to be produced, it becomes very

 7    clear, you know, who are the critical people

 8    involved in the decision-making, what were their

 9    roles over various time periods.  It's all very

10    evident from the documents.  And then plaintiffs can

11    ask their questions at the appropriate merit

12    deposition.

13                    I don't know how we would possibly

14    put up a 30(b)(6) witness on all of these topics for

15    the last, you know, however number of years we're

16    talking about.  It would seem to be virtually

17    impossible.  And again, Your Honor, I'm not aware of

18    anybody having to do this, and if this information

19    cannot be gleaned from what we've already provided,

20    I think the appropriate vehicle would be

21    interrogatories.

22                    I think we had talked about

23    interrogatories at our last conference or our

24    conference in July when a similar type information

25    was being requested.  I think the default is always
```

September 14, 2021

 1   "We're going to take a deposition," and why don't we

 2   really get to the merits and stop, you know, with

 3   the sideshow of a 30(b)(6) deposition every time we

 4   have a dispute.

 5                MS. LENZE:  Your Honor, so, if I may,

 6   one of the reasons -- well, let me start with this.

 7   To use a phrase that has been proffered by Ms. Kwuon

 8   earlier today, the information we have requires us

 9   to reverse engineer to find who the players are.

10                And the Court, Your Honors, have

11   already ordered in CMO 2 the defendants to provide

12   information about the departments and the divisions

13   for all defendants, and there are major gaps in what

14   they've produced.

15                For example, the information they

16   have produced in their, I believe it was, July 20th

17   letter only provided information from 2020 with

18   respect to the Allergan defendants.  With respect to

19   McGhan, it was only for one year; I believe '99.

20   With respect to Inamed, maybe 2002, 2003, to 2004.

21   But there are major holes in even the structure to

22   begin with.

23                And then their production of

24   organizational charts is similarly as lacking.  We

25   are given one year of maybe global medical, for

September 14, 2021

1    example.  Then maybe that's from 2010.  We've also

2    seen maybe something from 2012 of one department,

3    but we don't even know where to plug that department

4    in because we have no original chart from that year

5    to understand the structure.

6                    And the documents that they've

7    provided, including the 38 custodial names,

8    similarly leave us with kind of these gaps and

9    questions.  There's only seven individuals on that

10   list of the 38 that were a part of the companies

11   prior to 2006, and 2006 was when Allergan got

12   involved.  But McGhan has existed, you know, back

13   from 1974.

14                   And so, you know, we request this

15   information really about who was in charge of these

16   departments, what were the departments like in any

17   given year, and who ran these departments.  Even in

18   the 38 custodial names, we're given lots of

19   directors, we're given lots of -- we have no

20   understanding of who to go to or who to put up,

21   even, as our potential custodians because we don't

22   know what the structure is, we don't know the names.

23   And obviously, it goes to what they knew and when

24   they knew it.

25                   Obviously, one of the points that

September 14, 2021

 1   Allergan makes in their letter and was just made

 2   here is that, you know, this information about

 3   predecessors is tangential, but this information,

 4   plaintiffs' position is that this information is

 5   really critical.  The first presence of ALCL in the

 6   literature was even back in the '90s.

 7               So what the company was doing back in

 8   the '90s and who was responsible for doing it is

 9   really at the core of our case, and so we are, at

10   our most basic, requesting a years chart, really, of

11   what the structure looked like for any one of the

12   given companies and who was at the head of those

13   divisions.

14               JUDGE HARZ:  I think -- Judge

15   Dickson?

16               JUDGE DICKSON:  No, go ahead.

17               JUDGE HARZ:  I think we should have a

18   deposition.  The questions is, I'm not sure one

19   person can provide the information that is being

20   requested.  I understand what is being requested.  I

21   also agree it's not a tangential issue.  I circled

22   that in the letter that it's not tangential.

23               So I think what would be best --

24   actually, it's kind of already been done, but I

25   don't know if the plaintiffs want to write a letter

 1    indicating the information they want.  I mean, I

 2    hear names.  McGhan, Inamed.  I hear time frames.

 3    If you want to write a letter saying that you want a

 4    person with best knowledge to provide information

 5    regarding X, Y, and Z from such companies from this

 6    period of time to such period of time, because then

 7    defense counsel may want to produce two or three

 8    different individuals to respond to the scope of

 9    that deposition focus.

10               MR. SLATER:  Your Honor, we can even

11    -- that's a great idea.  I think we can even go one

12    better to try to save a step.  If we get a week, we

13    can serve the dep notice within a week.  That way it

14    will be spelled out exactly what we're looking for.

15    And we can even copy the Court if you want when we

16    submit it to the defense so you can --

17               JUDGE HARZ:  Yes.  Copy the Court, as

18    well.  In terms of scheduling the dep, I mean, once

19    you serve the notice, I think defense counsel will

20    have to determine who can respond to what.  It may

21    be two people, it may be four people.  I don't know.

22               But I agree, I'm kind of done with

23    this whole issue, and I think we -- plaintiffs

24    wanted to do the dep to begin with.  I said no.  We

25    were working -- and Judge Dickson said no.  Now it's

September 14, 2021

1    just do that.

2                MS. GEIST:  Your Honor, my only --

3    again, I don't mean to reargue again and again.  My

4    only, I guess, request or at least for

5    consideration, is why are interrogatories not the

6    appropriate vehicle for this type of --

7                JUDGE HARZ:  We're not going to get

8    the information unless someone is deposed with the

9    knowledge.  Interrogatories is more writing.  We're

10   done.  We're done with -- we have to move forward.

11   Do the deposition.  Let an individual answer who did

12   what when and who was in charge when, because the

13   plaintiffs need this so that they can move forward

14   to know what custodial records they need.  We all

15   know this.  We have to move this case.  Okay?

16   That's why.  Interrogatories aren't going to give

17   anything more than all the other papers.  They want

18   to move to questions.

19                JUDGE DICKSON:  So, Ms. Lenze, or

20   Mr. Slater, or both of you, the dep notice, and not

21   just to reiterate it, has to specifically go for

22   those gaps.

23                MR. SLATER:  They will.

24                MS. GEIST:  Do we have a time?  I

25   mean, you know what, Your Honors, what I would

September 14, 2021

```
 1   suggest is we will see the deposition notice, I

 2   suspect we will have some objections to scope and

 3   time period.

 4                JUDGE DICKSON:  Well, we'll do it the

 5   old-fashioned way.  You will respond to the dep

 6   notice and if you don't meet and confer to work it

 7   out, then you'll write a letter and I'll --

 8                JUDGE HARZ:  Yeah.

 9                JUDGE DICKSON:  Or Judge Harz will.

10                JUDGE HARZ:  Yeah.  Why would there

11   be objections as to who would have knowledge as to

12   organizational information of the company?

13                JUDGE DICKSON:  I think Ms. Geist was

14   talking about how far back they want to go, and to

15   what department they might want to.

16                I'm sorry.  Ms. Geist, why don't you

17   explain.

18                MS. GEIST:  No, that was exactly --

19   that was my thinking exactly.  Depending on the

20   departments we're talking about and --

21                JUDGE HARZ:  Okay.  Mr. Slater, how

22   far back is the deposition notice going to go?

23                MR. SLATER:  I think it's probably

24   going to go back quite a ways in terms of the

25   corporate relationships and identifying the people
```

1    in the departments that would make -- be the most

2    significant to the issues in the case, and we're

3    going to try to figure that out.  And we're happy,

4    once we serve the deposition notice, for the defense

5    to say, Hey, you know, this is what you really need,

6    and that is what you really need, and they can help

7    us with some vocabulary.

8              Some of these companies go back to

9    the '80s, but we're obviously not going to ask for

10   the name of every person that was in a certain

11   department in 1988, because that's going to be hard

12   to get.  We're going to figure out which are the

13   most salient features of the organizations that we

14   need, and as we move forward, we will probably need

15   more granular information.  And I think that these

16   questions from Your Honor and Judge Dickson help us

17   to know that we do need to focus and to make sure

18   what we're asking for in this deposition that we can

19   defend it.

20             MS. GEIST:  That sounds fine.

21   Keeping in mind the date of the label change,

22   keeping in mind when this new disease sort of came

23   into --

24             JUDGE HARZ:  Oh, speaking of the

25   label change, what are we going to do with regard to

September 14, 2021

```
 1   providing information as to when certain things --
 2   like particular dates.  Remember, there was a whole
 3   issue.  Plaintiffs wanted to know specific dates
 4   for --
 5                    MR. SLATER:  For approval and in use
 6   dates.
 7                    JUDGE HARZ:  Thank you.
 8                    What are we doing with that?
 9                    MS. GEIST:  We had a very lengthy
10   discussion about that, Your Honor, in July, and I
11   don't think we had a resolution.  I know Your Honor
12   said many times, forget about the charts, because I
13   highlighted it in the transcript, forget about the
14   charts.
15                    JUDGE HARZ:  Just give the
16   information, yeah.
17                    MS. GEIST:  Out opposition was, you
18   know, we're not creating charts since we're --
19                    JUDGE HARZ:  Well, everyone is going
20   to need to know that.  You need to know that, the
21   Court needs to know that, plaintiffs need to know
22   that.  So I just don't want to leave that hanging
23   because it's something that is going to come up
24   again.
25                    So are you meeting and conferring
```

1    about this?  What are we doing with the issue?

2                    MR. SLATER:  Your Honor, frankly, I

3    think that we are at the point where we are -- and

4    I'm almost embarrassed to have to say this because

5    I've never had such issues on such foundational

6    basic things.

7                    I don't know why, for example,

8    defense counsel doesn't want to provide a chart.

9    Whether they provide it in a list, on an abacus, I

10   would think that they would want an organized

11   document so everybody can refer to it when we get to

12   trial, and say, Everybody, we gave you this

13   information, you know when these things were in use,

14   so don't tell us you don't know.

15                   So I would like to -- whether it's a

16   chart or a list, they don't want to give it to us at

17   all, just like they don't want to give us

18   organization information.

19                   So I'm embarrassed to say we have to

20   depose a witness, and as the deposition goes on, put

21   each document in front of the witness, and say, When

22   was this approved?  When was it in use? and then

23   write it down and fill our own chart out and hand it

24   to the witness at the end of the deposition, and

25   say, That's what you told us, correct?  Now we have

1    our chart, because it's the only other way to go at

2    this point.  And I can tell you, if there's -- I

3    don't think there's any question in Your Honor's

4    mind about how important this information is.  I

5    mean, it's clear --

6                    JUDGE HARZ:  Everyone needs this

7    information.  Okay.  So I'm just asking, let me ask

8    defense, what is your plan with regard to responding

9    to this request, the approval and in use dates?

10                   MS. GEIST:  So I think Mr. Slater and

11   I should talk about it.  I am only aware of having

12   to do this once before, and that was pretrial, so it

13   was late in the game, when the discovery was done

14   and the parties were deciding what evidence they

15   wanted to use at trial.

16                   JUDGE HARZ:  How would you do the

17   depositions --

18                   MS. GEIST:  They were done, they were

19   done, Judge, because usually a revision date at the

20   bottom of communication pieces with physicians, and

21   directly to women, you know, patient-focused

22   communications.

23                   JUDGE HARZ:  Like, for example, if

24   you don't know when a particular brochure was used,

25   if you don't know when particular marketing material

1   was used, how do you ask questions about it at a

2   deposition?

3               MR. SLATER:  You don't, Judge.  What

4   you do is you guess.  And I can tell you in the MCL

5   in front of you with Ethicon, all of this was done.

6   We got all the charts.  Riker Danzig produced them

7   all.  And it made that litigation, as Your Honor

8   knows, seamless on this issue.  There was never a

9   question.  We know when everything was in use and we

10  don't ever have to come back and argue, and we don't

11  have questions, we don't have open ended --

12              JUDGE HARZ:  How can they give it to

13  you?  Who would you depose to get the information?

14              MR. SLATER:  I guess they'll have to

15  put up a witness or witnesses, and they'll have to

16  go through this -- we'll have to do somebody on the

17  DFUs, somebody on the patient brochures, someone on

18  the sales and marketing, and someone on the

19  professional education.  That's probably the way it

20  will have to happen because they don't want to just

21  cooperate and give us the information.

22              MS. GEIST:  It's not a question of

23  cooperation.  First of all, you're asking us to

24  create work product.  We're not obligated to do

25  that.  Second, in the DFUs, like the IFUs, there

 1   typically is an effective or revision date.  We have

 2   found it to be very, very close to impossible to

 3   give any, you know, this was the beginning date and

 4   this was the end date when this communication piece

 5   was out.  And we discussed that complexity and

 6   challenge before, you and I, Adam.

 7                MR. SLATER:  Right.  And I would say,

 8   Melissa, when we did this with Bard, you gave us --

 9   you gave me, when I asked for this, when I became

10   liaison counsel for the Bard litigation in Bergen

11   County, you got the DFU dates, I believe the patient

12   brochure dates.  You -- I think you got me marketing

13   dates.  And on professional education, Bard said,

14   "We don't know," and that was it.  They didn't know.

15   And then we knew that those can't be used against us

16   by Bard where they would come in and say, Well, this

17   was used with this doctor, now here's the date.  So

18   at least everyone was on a level playing field.

19                MS. GEIST:  Right, which was very,

20   very late.  It was very, very late in that

21   litigation, pretrial.  So why don't we --

22                MR. SLATER:  No, it was actually --

23   well, I don't want to argue with you.  Let's --

24                MS. GEIST:  Hold on.  We have an

25   order from Judge Dickson relating to the marketing

 1    and communication pieces.  Why don't we get that

 2    pushed out and get that produced to plaintiffs, and

 3    then we can meet and confer on what that looks like.

 4                    MR. SLATER:  Well, what this is going

 5    to do is it just pushes the ball so far down the

 6    road.

 7                    For example, when the documents come

 8    in to us and we start seeing emails -- make up a

 9    date -- January 1st, 2004, and someone says to

10    someone, you know, we have a problem with XYZ.  We

11    then need to be able to look at what were they

12    telling doctors immediately after that, what were

13    they saying in their marketing, what were they

14    saying in the DFU.  We need to be able to match up

15    and triangulate internal documents with what they

16    were saying to the world.

17                    And that's one of the -- not just --

18    so we don't need just this information for the

19    implanting doctors and learned intermediaries who

20    were critical; we also have to be able to know the

21    story.  What were they saying to the world and what

22    did they know internally, and the only way to know

23    that is by knowing the in use dates.

24                    I find it hard to imagine the company

25    doesn't know when things went into use because

September 14, 2021

```
 1   that's something that is tracked very carefully by
 2   the marketing and sales people.
 3              MS. GEIST:  No, it's typically not.
 4              MR. SLATER:  If they don't know, they
 5   don't know.
 6              MS. GEIST:  But I am going to
 7   apologize again.  I have to run a meeting at 1 p.m.
 8   We are way over our time.  Maybe we need to --
 9              JUDGE HARZ:  I want to revisit this
10   approval and in use dates, because if you can't
11   agree, we'll just schedule a depositions around it.
12   Okay?  But you talk, you figure out what you want to
13   do, and we can --
14              When is our next meeting, Judge
15   Dickson?
16              JUDGE DICKSON:  I don't think we have
17   one scheduled.
18              JUDGE HARZ:  Okay.  And are we going
19   to send out an order regarding these particular
20   dates what we agreed to today for all counsel?
21              JUDGE DICKSON:  Oh, yeah.
22              JUDGE HARZ:  Okay.  And when would
23   you like to meet again, so we can let Ms. Geist go.
24              MR. SLATER:  Your Honor, I was going
25   to suggest that maybe we start to schedule the
```

1    hearings if a little shorter time frames and start

2    to do this more often, just because then the issues

3    will be fresh and we can get closure on the issues

4    in a little bit more of a shorter turnaround, if

5    that's okay with --

6                    JUDGE HARZ:  Okay.  So today is

7    September -- what's today?

8                    MR. KELLY:  14th.

9                    JUDGE HARZ:  14th.  Just not the

10   first week in October, please.

11                   MS. GEIST:  We have October 19

12   scheduled for the next conference.

13                   MR. SLATER:  What about September 30,

14   Your Honor?

15                   JUDGE DICKSON:  I can do September

16   30th.

17                   JUDGE HARZ:  I can do September 30.

18                   MS. KWUON:  I'm traveling on the

19   30th.

20                   JUDGE HARZ:  Who is that?  I'm sorry.

21                   MS. KWUON:  It's Janet Kwuon for

22   Allergan.  I'm traveling on the 30th.

23                   MR. SLATER:  We would be very

24   concerned about pushing it beyond that, so --

25                   JUDGE HARZ:  October 1st?

September 14, 2021

```
 1                    MR. SLATER:  That's fine with me.

 2                    MS. GEIST:  I can't do it on October

 3    1st.  I'm sorry.

 4                    JUDGE HARZ:  Wednesday, the 29th?  I

 5    have another big thing in the morning.  I could do

 6    it after 1:00.

 7                    MR. SLATER:  That's fine.

 8                    MS. KWUON:  I'm sorry.  The 29th and

 9    30th are both travel days for me.

10                    JUDGE HARZ:  Okay.  How about the

11    28th?

12                    MR. KELLY:  I have a deposition that

13    day, Your Honor.

14                    MS. GEIST:  Can we do it after the

15    deposition, Judge?  What about that first week in

16    October.

17                    JUDGE HARZ:  The first week in

18    October, I'm away.

19                    MR. SLATER:  Can we just do it on the

20    30th?  I understand Janet is going to be traveling,

21    but some of these issues we just need to be able to

22    get closure from the perspective of everybody, I

23    would think.  I'm just concerned about pushing it

24    beyond that week.

25                    MS. GEIST:  I think you realize that
```

1    Janet is our main contact person on all things

2    discovery.

3                    MS. KWUON:  Sorry for everybody else.

4                    MR. KELLY:  Have we proposed the 27th

5    yet?

6                    MR. SLATER:  That's fine.

7                    MR. KELLY:  I realize it's less than

8    two weeks, but it's better than waiting a month.

9                    JUDGE HARZ:  I'm okay the 27th.

10                   JUDGE DICKSON:  I'm good.

11                   JUDGE HARZ:  Okay.  What time?

12                   MS. KWUON:  Can we do it again at

13   11:00 Eastern?

14                   JUDGE HARZ:  11:00 Eastern.

15                   JUDGE DICKSON:  Okay.

16                   MS. LENZE:  Your Honors, we just have

17   one other issue on the agenda today, and

18   understanding Allergan's response from September

19   10th indicated with respect to the RFPs --

20                   MR. SLATER:  Jen, can I just

21   interrupt you one second.

22                   MS. LENZE:  Yeah, sure.

23                   MR. SLATER:  I apologize.  I have a

24   deposition of an expert to take in four minutes.

25   Can I be excused?

September 14, 2021

```
 1                    JUDGE DICKSON:  Ms. Geist has to go.
 2                    Ms. Geist, can you make somebody else
 3      the host?
 4                    MS. GEIST:  I don't know, Judge.  If
 5      I hit end, I don't know.
 6                    MS. LENZE:  And all I was going to
 7      ask was just for a date certain that Allergan
 8      supplements, that's it, in 30 seconds.
 9                    MS. KWUON:  I can't give you a date
10      like on the spot, but I'll get back to you today.
11                    MS. LENZE:  Okay.
12                    MS. KWUON:  I think then we're done.
13                    JUDGE HARZ:  Thank you, everybody.
14      Okay.  Bye.
15                          -  -  -
16          (Conference adjourned at 12:57 p.m.)
17
18
19
20
21
22
23
24
25
```

September 14, 2021

```
 1              C E R T I F I C A T I O N

 2

 3         I, CONSTANCE E. PERKS, CCR, CRR, CRC, RSA,

 4    a Certified Realtime Court Reporter and Notary

 5    Public in and for the State of New Jersey, do hereby

 6    certify the foregoing to be prepared in full

 7    compliance with the current Transcript Format for

 8    Judicial Proceedings, and a true and accurate

 9    transcript to the best of my knowledge and ability.

10

11

12

13    _____

14         Constance E. Perks, CCR, CRR, CRC, RSA

15         Notary Public and Certified Court

16         Reporter of the State of New Jersey

17         NJ CCR License #30XI00142900

18         Dated:  September 15, 2021

19

20

21

22

23

24

25
```

EXHIBIT B

1                 UNITED STATES DISTRICT COURT
                  DISTRICT OF NEW JERSEY
2                 CASE NO. 2:19-MD-02921 (BRM)(ESK)
3                         -   -   -
4
5   IN RE:  ALLERGAN BIOCELL TEXTURED      :
    BREAST IMPLANT PRODUCTS LIABILITY      :
6   LITIGATION                             :
                                           :   MDL NO. 2921
7   -----------------------------------    :
                                           :
8   This Document Relates To:              : CONFIDENTIAL
    All Cases                              :
9
10                        -   -   -
                  SEPTEMBER 28, 2021
11                        -   -   -
12
13                  TRANSCRIPT of the videotaped
14  30(b)(6) deposition testimony of ROGER A. HUFF, held
15  remotely via Zoom on the above-referenced date and
16  commencing at 9:01 a.m. PST, as stenographically
17  reported by Constance E. Perks, CRR, CCR, CRC, RSA,
18  a Federally-Approved Certified Realtime Reporter and
19  Notary Public, NJ CCR License #300XI0142900.
20
21
22
23
                          -   -   -
24          GOLKOW LITIGATION TECHNOLOGIES, LLC
            ph 877.370.3377  |  fax 917.591.5672
25                  deps@golkow.com

Confidential - Roger A. Huff

```
 1              relevant ESI sources.
 2   BY MR. KELLY:
 3        Q.    And I'm going to list them and
 4   make sure that you understand that you're here
 5   to speak about them today.
 6              Does that make sense, Mr. Huff?
 7              MS. KWUON:  Can I ask to see the
 8         document all the way through, and then
 9         the date on it?
10              MR. KELLY:  Sure.
11              And it keeps going into the --
12         there's an attachment of the original
13         30(b)(6) notice.
14              MS. KWUON:  And can we go off
15         the record for just a second?
16              MR. KELLY:  We have a pending
17         question, actually.
18              MS. KWUON:  Oh.  What's the
19         pending question?  Sorry.
20   BY MR. KELLY:
21        Q.    Do you understand that you
22   are -- I can phrase it again.  Sorry.
23              I'm going to list the four
24   potentially relevant ESI sources that are
25   within the scope of your deposition.  Those
```

1    are Box, voicemail, SharePoint, and Skype.

2                    Is that your understanding of

3    the scope of this deposition?

4          A.    Yes.

5          Q.    Thank you.

6                    MS. KWUON:  Okay.  Thanks, Max.

7                    And can we go off the record for

8          a second?

9                    MR. KELLY:  Sure.

10                    THE VIDEOGRAPHER:  The time is

11         9:18.  We are off the record.

12                    (A recess was taken.)

13                    THE VIDEOGRAPHER:  The time is

14         9:22.  We are back on the record.

15    BY MR. KELLY:

16         Q.    So just before the break, we

17    clarified that the four data sources at issue

18    in this deposition are Box, SharePoint,

19    voicemail, and Skype.  Is that right?

20         A.    That's correct.

21         Q.    And you have been designated

22    today as a corporate representative to give

23    testimony on behalf of the company.

24                    Do you know what that means?

25         A.    I believe so.

Confidential - Roger A. Huff

 1                 privileged information.

 2                     But you can answer beyond that.

 3                     THE WITNESS:  No.

 4    BY MR. KELLY:

 5         Q.     So you -- you don't know what

 6    steps, if any, Allergan took to preserve

 7    documents relevant to this litigation?

 8         A.     That's correct.  I do not.

 9         Q.     Okay.  Are you aware of the

10    settings or policies with regard to any of the

11    four data sources we're here to talk about

12    today - that's Box, SharePoint, voicemail, and

13    Skype - are you aware of policies or settings

14    changing for any of those four sources in

15    connection with the litigation hold?

16                     MS. KWUON:  Objection as to

17              form; compound, vague and ambiguous,

18              lacks foundation.

19                     But you can answer the question.

20                     THE WITNESS:  If you could help

21              me with understanding the two parts.

22              Am I aware of policies, or am I aware

23              of settings being changed?

24    BY MR. KELLY:

25         Q.     Its only the latter.  Let

EXHIBIT C

```
 1                    UNITED STATES DISTRICT COURT

 2                    DISTRICT OF NEW JERSEY

                     CASE NO. 2:19-MD-02921 (BRM)(ESK)

 3

                              -  -  -

 4

 5   IN RE:  ALLERGAN BIOCELL TEXTURED    :

     BREAST IMPLANT PRODUCTS LIABILITY    :

 6   LITIGATION                           :

                                          :  MDL NO. 2921

 7   -----------------------------------  :

                                          :

 8   This Document Relates To:            : CONFIDENTIAL

     All Cases                            :

 9

10                       -  -  -

                     SEPTEMBER 28, 2021

11                       -  -  -

12

13               TRANSCRIPT of the videotaped

14   30(b)(6) deposition testimony of VICTOR HUYNH, held

15   remotely via Zoom on the above-referenced date and

16   commencing at 1:08 p.m. PST, as stenographically

17   reported by Constance E. Perks, CRR, CCR, CRC, RSA,

18   a Federally-Approved Certified Realtime Reporter and

19   Notary Public, NJ CCR License #300XI0142900.

20

21

22

23

                              -  -  -

24        GOLKOW LITIGATION TECHNOLOGIES, LLC

          ph 877.370.3377  |  fax 917.591.5672

25               deps@golkow.com
```

Confidential - Victor Huynh

1           that adverse incident reports,

2           investigation, or reporting.

3                So you have our designation of

4           what the witness is going to cover.

5                MR. BUCHANAN:  Yeah, and I

6           thought it was co-extensive with topic

7           1 and subcategory of b.  Is there

8           something you're carving out there,

9           because I believe we're limited on

10          technical topics here.

11               MR. COHEN:  Yeah, so it

12          certainly -- it -- what he's going to

13          testify to is certainly part of what's

14          in 1.b., but he is testifying with

15          regard to a particular database, and

16          that's not to say that's the only

17          document out there that has to do with

18          adverse incidents, investigations, or

19          reporting.

20               But reporting in that particular

21          database is what he's designated for.

22               MR. BUCHANAN:  Fair enough.  So

23          you're scoping -- just so we're on the

24          same page, you're scoping and limiting

25          him specifically to TrackWise,

Confidential - Victor Thayln

```
 1          correct?

 2                  MR. COHEN:  Correct.

 3                  MR. BUCHANAN:  Okay.  But no

 4          other concern with regard to the

 5          topics and the introductory paragraph

 6          of 1?

 7                  MR. COHEN:  No other objection.

 8                  MR. BUCHANAN:  That's fine.

 9          Thank you.

10   BY MR. BUCHANAN:

11          Q.    Moving on to 2, sir:  "The

12   Allergan Defendants' information files,

13   including currently maintained computer files,

14   as well as historical, archival, back-up, and

15   legacy computer files, whether in current or

16   historic media or formats, such as digital

17   evidence that may be used to support claims or

18   defenses."

19                  Do you see that, sir?

20          A.    I do, yeah.

21          Q.    Are you prepared to testify with

22   regard to that topic as it relates to

23   TrackWise?

24                  MR. COHEN:  I'm going to --

25                  THE WITNESS:  I --
```